74 N.J. Super. 591 (1962)
181 A.2d 818
MIDDLESEX COUNTY SEWERAGE AUTHORITY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
BOROUGH OF MIDDLESEX, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Argued April 26, 1962.
Decided May 31, 1962.
*594 Mr. Edward J. Johnson, attorney for plaintiff.
Messrs. Rafferty & Blacher, Mr. Henry Handleman, Messrs. Takacs & Smith, Mr. Morris Roth, Mr. Herman B. Hoffman, Mr. Christian J. Jorgensen, Mr. Leon Semer, Mr. Louis J. Milano, Mr. Joseph T. Karcher, Mr. Henry M. Spitzer, Mr. Joseph C. Doren, Mr. John T. Keefe, Mr. Stanton L. Levy, Messrs. Beekman & Ozzard, Mr. Elia Barbati, Jr., Messrs. Meredith & Norris, Messrs. Reid & Reid, Messrs. Sachar, Sachar & Bernstein, Messrs. Stryker, Tams & Dill, Messrs. Wharton, Stewart & Davis, Messrs. Pitney, Hardin & Kipp, Messrs. Hannoch, Weisman, Myers, Stern & Besser, Messrs. Wilentz, Goldman, Spitzer and Sills, Messrs. Carpenter, Bennett & Morrissey, Messrs. Riker, Danzig, Marsh & Scherer, Messrs. Seymour & Seymour, attorneys for defendants.
COHEN, J.S.C.
Plaintiff, Middlesex County Sewerage Authority (authority) by a declaratory judgment action, seeks determination of the validity of the rate formula and schedules contained in contracts executed between it and the municipalities, other sewerage authorities and private industrial corporations joined as defendants herein who constitute the entire group of participants in the sewerage *595 project. All agree that declaratory judgment is the proper remedy; however, five defendants, the Boroughs of Middlesex, South River, South Bound Brook and Bound Brook, and the Piscataway Township Sewerage Authority (contestants), challenge the validity of the rate formula and schedules. The remaining 24 defendants either join the plaintiff in urging the validity of the aforesaid contract terms or content themselves with the adjudication of the court. The matter is before the court on briefs, pleadings, affidavits, exhibits and oral arguments. Plaintiff-authority moves for summary judgment and dismissal of counterclaims urging that no genuine issue exists as to any material fact and, accordingly, is entitled to judgment as a matter of law.

STATEMENT OF FACTS.
The Raritan River extends through the central area of Middlesex County, from Bound Brook to Sayreville and South Amboy, to Raritan Bay, and then to the Atlantic Ocean. Historically it provided splendid bathing, fishing and other advantages common to an unpolluted body of water. With rapid growth of population and expansion of industry in the Raritan Valley, existing facilities for treatment of sewage and industrial waste became acutely inadequate. Gross pollution of the river resulted. Municipalities and industries were faced with large capital and operating expenditures in efforts to abate this pollution. The community became increasingly aware of these conditions; public-spirited citizens of vision recognized the possibility that the Raritan would become a detriment rather than an asset to the municipalities, industries, and residents of the lower valley. Public sentiment demanded action. In response to the need, the board of chosen freeholders created a Middlesex County Sewerage Authority, which was formally organized on August 1, 1950 pursuant to the Sewerage Authorities Law, N.J.S.A. 40:14A-1 et seq., enacted in 1946.
*596 This act is designed to relieve the waters in and bordering the State from pollution, and to that end empowers a county or a municipality alone, or in combination with others, to create sewerage authorities to erect and operate plants for the collection and disposal of sewage. N.J.S.A. 40:14A-2 provides:

"Declaration of policy; purpose
It is hereby declared to be in the public interest and to be the policy of the State to foster and promote by all reasonable means the relief of waters in or bordering the State from pollution and thus to reduce and ultimately abate the menace to the public health resulting from such pollution. It is the purpose and object of this act to further implement such policy by
(1) Authorizing counties, or municipalities either separately or in combination with other municipalities, by means and through the agency of a sewerage authority, to acquire, construct, maintain, operate or improve works for the collection, treatment, purification or disposal of sewage or other wastes, and, if necessary, works for the impounding, transportation and release of water for the replenishment in periods of drought or at other necessary times of all or a part of waters in or bordering the State diverted into a sewer, sewage treatment or sewage disposal system operated by the sewerage authority; * * *"
The purpose of the act is repeated in N.J.S.A. 40:14A-6 and N.J.S.A. 40:14A-7.
The Sewerage Authorities Law constitutes a sewerage authority a public body politic and corporate, as a subdivision of the state, with enumerated powers, including the right "to enter into any and all contracts, execute any and all instruments, and do and perform any and all acts or things necessary, convenient or desirable for the purposes of the sewerage authority or to carry out any power expressly given in this act." N.J.S.A. 40:14A-7(11).
Pursuant to its organization the authority and prospective participants commenced negotiations for mutually acceptable contract terms with regard to their respective rights and corresponding obligations. Each term and condition of the service contract (contract) was thoroughly discussed by the parties. The first complete draft was prepared in May 1951, *597 and circulated among various eligible municipalities and industries. During the following years innumerable suggestions and requests for modification were received from attorneys, engineers and officials of the interested municipalities and industries. As a result at least ten redrafts of the agreement were prepared and distributed. Several of the municipalities and industries which had indicated initial interest found the proposed terms unacceptable and abandoned the project. It is apparent, therefore, that the agreement was not hastily prepared, nor ill-considered, nor was there blind reliance by the participants upon representations made by the plaintiff-authority. The contract was finalized in August 1954.
Commencing in February 1958 plaintiff imposed charges upon defendants in accordance with the initial schedule of rates contained in schedule B of the contract. This schedule sets up a sliding scale whereby participants are charged $187 per million gallons of sewage delivered into the sewerage system for the first five million gallons, $123 per million gallons for the next five million gallons, and so on down the line, the cost per million gallons decreasing as the amount of sewage delivered into the system increases. Article IV of the contract recites the relevant provision that, "Such charges made and imposed by the Authority shall be computed * * * at rates which shall at all times be uniform as to all Participants for the same type, class and amount of use or service * * * and give effect to quantity differentials in substantially the proportions reflected in the rates set forth in the Initial Schedule of Rates * * * marked `Schedule `B' * * * and the rates applicable with respect to sewage so delivered and discharged * * * by any Participant shall not be more favorable to such Participant than the rates applicable with respect to sewage so delivered and discharged by any other Participant. * * *" (Emphasis added). Plaintiff continued to impose charges on defendants in conformity with schedule B, which was thereafter, upon notice to all participants and at public hearings, *598 revised in accordance with the procedure set forth in the contract.
Plaintiff alleges that doubts have arisen with respect to the validity of the rate schedule as a result of continued attack by municipal bodies, citizens' committees and the public press, and nonpayment by one of the municipalities. Accordingly, plaintiff instituted this action for declaratory judgment. The legislation itself is not challenged, but the contestants contend the statute indicates a legislative intent that rate charges for all users of the same type, class and amount shall be substantially on the same basis and such charges shall be uniform for the same type, class and amount of use or service. Simply stated, the challenging defendants attack the sliding scale or escalator clause and urge that regardless of quantity and quality the rates must be the same for all participants.

ISSUES INVOLVED.
Rebate claims for overpayment were made by several defendants in the event of an adjudication of contract invalidity, but were withdrawn at oral argument.
Resolution of the following pivotal issues will be dispositive of this motion:
(1) Is a declaratory judgment a proper proceeding to settle the dispute between the parties?
(2) Is the rate formula and initial schedule of rates contained in the contract legally derived from a valid exercise of powers conferred upon the authority by N.J.S.A. 40:14A-1 et seq.?
(3) Were the contesting defendants induced to enter into the contract as a result of erroneous representations made by plaintiff with respect to schedule D of the contract?
(4) Is the schedule of rates provided in the contract arbitrary, discriminatory and unreasonable thereby presenting a factual issue precluding summary judgment?
These issues will be considered seriatim.

*599 PRINCIPLES OF LAW.
(1) A declaratory judgment is the most expeditious and effective proceeding to obtain a judicial determination of the legality and validity of plaintiff's schedule of rates. The Declaratory Judgment Act, N.J.S. 2A:16-50 et seq., is a remedial device designed to expedite the definitive establishment of private rights and duties thereby forestalling the emergence of costly and cumbersome proceedings. Moss Estate Inc. v. Metal & Thermit Corp., 73 N.J. Super. 56 (Ch. Div. 1962). N.J.S. 2A:16-53 provides:
"A person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."
It should be noted, however, that the remedy provided by the act is limited to those classes of cases where an actual controversy exists.
"Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and defendant, subject to the court's jurisdiction, having an interest in opposing his claim."
Borchard, Declaratory Judgments (2d ed. 1941), p. 29. See also Condenser Service and Engineering Co. Inc. v. American Mutual Liability Ins. Co., 45 N.J. Super. 31 (App. Div. 1957). In the case at bar, one of the defendants has breached the terms of the contract by refusing to pay its estimated installment of charges for the fourth quarter of 1961. It has done so on the theory that the contract is illegal and violative of the Sewerage Authority Law. Surely, the plaintiff, as a party to the contract, is "a person interested under a * * * written contract [who] * * * may have determined any question of construction or validity arising under the * * * contract." N.J.S. *600 2A:16-53, supra. A review of the pleadings and affidavits indicates that an actual controversy exists. Questions of significant interest affecting hundreds of thousands of citizens within many municipal jurisdictions throughout three counties of this State are involved. Doubts with regard to the authority's right to encompass the existing rate structure in future authority contracts have arisen.
Upon examination of the voluminous pleadings and exhibits, the court is aware of the intolerable burden that would result if separate actions were to be instituted by many of the users. Justice Jacobs, speaking for the Supreme Court, stated:
"* * * The policy considerations which may be advanced in favor of proceedings limited to declaratory relief will oftentimes have to be carefully weighed by the trial court in the light of the modern concept that the sound administration of justice will generally be served better by disposing of all matters in controversy between the parties at one time and place. * * *" National-Ben Franklin Fire Ins. Co. v. Camden Trust Co., 21 N.J. 16, 23 (1956).
If the court were to grant declaratory relief in the instant case, such a course of action would be "in line with the whole theory of declaratory judgment to consider and render such a declaration at a time when the issue may be considered calmly and unhurriedly and the fullest measure of its tranquilizing effect exploited in the interests of justice." Bontempo v. Carey, 64 N.J. Super. 51, 58 (Law Div. 1960).
(2) In determining whether the rate formula and initial schedule of rates contained in the contract are legally derived from a valid exercise of powers conferred upon the authority by N.J.S.A. 40:14A-1 et seq., the pertinent sections of the statutory inquiry must be examined.
N.J.S.A. 40:14A-8 defines the authorized rates and service charges, providing:
"Rates and service charges
(a) Every sewerage authority is hereby authorized to charge and collect rents, rates, fees or other charges * * * for direct or indirect connection with, or the use or services of, the sewerage *601 system. Such service charges may be charged to and collected from any person contracting for such connection or use or services or from the owner or occupant, or both of them, of any real property which directly or indirectly is or has been connected with the system or from or on which originates or has originated sewage or other wastes which directly or indirectly have entered or may enter the sewerage system, * * *.
(b) Such rents, rates, fees and charges, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system, and may be based or computed either on the consumption of water on or in connection with the real property, making due allowance for commercial use of water, or on the number and kind of water outlets on or in connection with the real property, or on the number and kind of plumbing or sewerage fixtures or facilities on or in connection with the real property, or on the number of persons residing or working on or otherwise connected or identified with the real property, or on the capacity of the improvements on or connected with the real property, or on any other factors determining the type, class and amount of use or service of the sewerage system, or on any combination of any such factors * * *." (Emphasis added)
N.J.S.A. 40:14A-23 then treats with authorized dealings between a sewerage authority and a county, a municipality, or another sewerage authority, providing:
"Contracts for treatment or disposal of sewage; powers of sewerage authority
* * * Such contract or contracts may provide for the payment * * * of such sum or sums of money, computed at fixed amounts or by a formula based on any factors or other matters described in subsection (b) of section eight of this act or in any other manner, as said contract or contracts may provide, * * *. Any such contract may be made with or without consideration and for a specified or an unlimited time and on any terms and conditions which may be approved by such municipality and which may be agreed to by the sewerage authority * * *." (Emphasis added)
The court is called upon to interpret, inter alia, these two sections. Contestants claim that the standards of section 8, the keystone of which is uniformity, must control all contracts enacted pursuant to section 23 where a formula is employed to determine sewage charges, as in the case sub judice.
*602 The practical inquiry in litigation is usually to determine the meaning of a particular provision, clause, or word. To answer it one must proceed as he would with any other composition  construe it with regard to the basic idea or purpose of the entire instrument. A statute is passed as a whole, not in parts or sections, and is animated by one general motive or intent. Consequently, each section should be construed with every other part or section so as to produce a harmonious whole.
In determining whether sections 8 and 23 are mutually exclusive there are several factors which influence this court's decision. It is unquestionable, upon examination of the nomenclature which gave birth to its meaning, that section 8 does not apply to municipalities unless they are owners of real property and unless a direct levy is attempted to be made upon them as such. Clear proof of this is evinced by the language of the Legislature in drafting this section:
"* * * such service charges may be charged to and collected from any person * * *" N.J.S.A. 40:14A-8 (Emphasis added).
Significantly, "county" or "municipality" is not included in the above, and the word "person" as defined in N.J.S.A. 40:14A-3, is:
"* * * any person, association, corporation, nation, State or any agency or subdivision thereof, other than a county or municipality of the State or a sewerage authority. * * *"
Thus, it is apparent from a perusal of the statute, that the Legislature has seen fit to provide distinct classifications, and standards applicable to these classifications, in determining annual rate charges. Section 23 states that contracts may provide for payments by a formula based on any factors or other matters described in subsection (b) of section 8. The word "any" is conspicuous. I interpret the word "any," as used in the context of this statute, to be an indefinite adjective used to designate things in a *603 general way without pointing out any one in particular; implying singularity in number, or selectivity among a number, and not susceptible of a categorical definition meaning "all" or "every." Slegel v. Slegel, 135 N.J. Eq. 5 (Ch. 1944), affirmed 136 N.J. Eq. 102 (E. & A. 1944). If the Legislature desired to ensure application of the safeguards of section 8 to section 23, it need merely have so indicated by the appropriate language. Furthermore, section 23 includes this pertinent provision:
"* * * Any such contract may be made with or without consideration and for a specified or an unlimited time and on any terms and conditions which may be approved by such municipality. * * *" (Emphasis added)
This language is a clear legislative mandate granting to municipalities and sewerage authorities the right to contract on any terms and conditions approved by both agencies.
Section 8 deals with a captive population within a sewage district. Direct assessments against real property are there involved. These captives within the district have no alternative but to connect their sewers to the authority's system. They cannot negotiate contractually on terms, conditions, or the like. Wisely, the Legislature has set up safeguards for their protection. However, under section 23, free bargaining and negotiation on contract terms is permitted and is expected to be undertaken in arriving at the respective diversified interests of each governmental segment so contracting.
"* * * As between authorities [a fortiori municipalities and authorities], the right to contract with the expectancy that each shall serve its own advantage is a power granted by the Legislature, not limited in time or terms and conditions. * * *" Beverly Sewerage Authority v. Delanco Sewerage Authority, 65 N.J. Super. 86, 97 (Law Div. 1961), affirmed 70 N.J. Super. 575 (App. Div. 1961).
In conclusion, on this issue, considering the permissive tenor of section 23 and the various factors indicated, I find that the general rate formula enacted pursuant to section 23 need not be governed by section 8 standards. These various *604 optional provisions contained in section 23 give flexibility which in some cases may produce higher efficiency.
(3) The contestants assert that they were induced to execute the contract as a result of their reliance on representations contained in that portion of the contract entitled schedule D. It is entitled "Estimate of Annual Service Charges," and contains a list of municipalities and corporations together with a corresponding "Estimated Annual Service Charge" payable by these participants. In defense of the misrepresentation charge plaintiff-authority advances the statute of limitations and laches. I find that neither defense is applicable and proceed to a disposition of this issue on the merits.
The scope of particular representations is a matter of construction. Language used is to be interpreted by its effect upon an ordinary mind. Words will be given their usual and natural meaning. Thus viewing the pleadings, exhibits, affidavits, briefs and arguments in the light most favorable to defendants, it must be determined whether a genuine issue of fact exists as to the issue of false representation of the estimated annual rate charges.
An examination of schedule D compels a conclusion that its language is clear and unambiguous. There is no difficulty in ascertaining from the schedule itself the intention of the parties. An estimate is a mere approximation. P.M. Hennessy Construction Co. v. Hart, 141 Minn. 449, 170 N.W. 597 (Sup. Ct. 1919). The word "estimate" precludes accuracy, and its ordinary meaning is to calculate roughly or to form an opinion from imperfect data. The word "estimate" has no more certainty than the words "about" or "more or less." New Orleans Terminal Co. v. Dixie Rendering, Inc., 179 So. 98, 100 (La. Ct. App. 1938). State Highway Commission of Kentucky v. Board of Councilmen of City of Frankfort, 245 Ky. 799, 54 S.W.2d 315, 319 (Ct. App. 1932). It strains belief that these municipalities considered the "estimates" as a warranty or a material representation of actual fact. See Van Sant v. *605 Perry, 174 N.Y.S. 658 (Sup. Ct. App. 1919); Annotation, "Misrepresentation  Income or Profits," 27 A.L.R.2d 14 (1953).
Statements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations even though they turn out to be false, at least where they are not made with intent to deceive, and where the parties have equal means of knowledge, Halpern v. Cafarelli, 98 N.J.L. 77 (Sup. Ct. 1922); Anderson v. Modica, 4 N.J. 383 (1950); Comfort Spring Corp. v. Brooks Equipment Corp., 13 N.J. Super. 564 (App. Div. 1951); Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369 (App. Div. 1960), or the subject is equally open to the investigation of both, and an examination has not been fraudulently prevented.
The contestants allege that they were misled, maintaining that great disparity existed between the expertise of the authority and that of the municipalities. This contention smacks of hindsight. Plaintiff is not a soothsayer. Disposal of sewage can hardly be termed a novel public service. Undoubtedly it was of familiarity and concern to the various municipalities ever since their creation. It seems reasonable to assume that each municipality with the assistance of its officials, attorneys, engineers and experts, if necessary, was, or could have been, in at least as good a position as the authority to prepare this estimate. Further, the amounts contained in schedule D were supplied, and presumably verified, by the engineers and operating personnel of the participants' sewage departments. These contesting municipalities must have painstakingly weighed the costs of sewage disposal under the instant contract as against an operation of their own, or one in concert with others. The authority contends that all these considerations prompted the acceptance and execution by the contestants of the contract.
Where both parties to a contract have or can acquire the same amount of knowledge as to its subject matter, one *606 party may not attack the contract by alleging reliance on representations made by the other. Condon v. Sandhowe, 97 N.J. Eq. 204 (Ch. 1925); Norfolk and New Brunswick Hosiery Co. v. Arnold, 49 N.J. Eq. 390 (Ch. 1892).
On motion for summary judgment it is movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact; all inferences of doubt are drawn against movant in favor of the opponent and papers supporting motion are closely scrutinized and opposing papers indulgently treated. R.R. 4:58, 4:58-3 to 5. I am not unmindful of the Supreme Court's admonition in Judson v. People's Bank & Trust Co. of Westfield, 17 N.J. 67 (1954), that it is ordinarily very difficult to sustain the conclusion, based solely on the presentation of papers, that there exists no genuine issue of material fact with respect to allegations of misrepresentation or fraud. Aside from the allegation in the complaint of misrepresentation, no evidence can be found, either in the briefs submitted or upon oral argument, to support this claim. In Judson it is stated that "summary judgment procedure pierces the allegations of the pleadings to show that the facts are otherwise than as alleged" (at p. 75)
In further support of plaintiff's contention that schedule D did not constitute a representation of future operating charges they point to the following footnote:
"Note: Actual charges on date of commencement of operations will be calculated by application of rates (see Schedule B and Article IV and V) to quantity, quality and other characteristics of sewage then existing; estimates are to aid in applying formula for apportioning contributors share of temporary funds if the engineers certificate on construction costs exceeds allowable limit of estimated construction costs pursuant to Article XII." (Emphasis added)
Plaintiff maintains that the above negatives any false representation or that the estimate had any reference to future charges to be imposed upon participants. It was designed primarily, it contends, as a computation or formula for apportioning each contributors share of a reserve fund *607 in the event of a deficit in operation or construction costs. Since the project was completed at the estimated cost and since no operational deficit existed, this formula was never utilized.
In view of the court's determination that schedule D did not constitute a misrepresentation or a warranty but was merely an estimate, no disposition need be made of this phase of the plaintiff's contention.
(4) Contestants maintain that the rates adopted by the authority are arbitrary, discriminatory and unreasonable in that they are more favorable to certain participants than to others in violation of the terms of article IV of the contract which, on page nine, provides:
"Changes and Establishment of Rates by Authority  The Authority will make and impose charges with respect to all sewage delivered into the Trunk System by any Municipality, Company, or any other person, partnership firm or corporation. * * * Such charges made and imposed by the Authority shall be computed * * * at rates which shall at all times be uniform as to all Participants for the same type, class and amount of use or service * * * and give effect to quantity differentials in substantially the proportions reflecting in the rates set forth in the Initial Schedule of Rates * * * marked `Schedule B'. * * *" (Emphasis added)
The uncontradicted affidavit by plaintiff's engineering consultant states that the authority has given effect to quantity differential in substantially the same proportions reflected in the rates set forth in the contract. It is apparent that plaintiff is merely enforcing a rate schedule adopted, after free and thorough discussion, by all parties in interest. The participants in the sewerage project, when negotiating for a rate formula, decided that uniformity of rates within separate classes, giving effect to quantity differential, was the proper standard to meet the test of reasonableness. All members within any one particular class are treated alike. These contestants now come forward with the contention that in determining the reasonableness of the rate schedule, the court must inquire whether there *608 is any justification for treating the smaller users of the authority differently from the larger users. They proceed to argue that the reduction of rates for larger quantities delivered into the trunk system is not related to an equivalent reduction in the cost of service. In support thereof they have submitted an affidavit of a consulting engineer.
Confronted with multiple problems and the salutary purpose of river pollution abatement, the authority undoubtedly exerted every effort to interest as many prospective participants, small and large, as possible. Regarding the over-all economic picture, it would appear that one substantial sewerage authority is distinctly more advantageous to all users, for innumerable obvious reasons, than a series of smaller individual treatment plants. The sliding scale was an inducement or incentive to attract the larger users, industrial and municipal, for economic reasons of bond issuance, construction and operation. Municipalities, especially, had a very real stake in joining a first-rate project. Not only was the policy of the statute furthered, but a vital service was rendered to residents and to industry. For purposes of income, employment, prestige and other sound reasons, municipalities are understandably desirous of attracting new industries within their confines. Notice may be taken that substantial new industry is not drawn to any area that does not provide proper sewage disposal service.
The decision of the parties at the time of contracting should not be lightly disturbed. The law in New Jersey, as elsewhere, is that municipal contracts stand on the same footing as contracts between natural persons, and the courts will not inquire into the reasonableness of the terms of such contracts absent bad faith, fraud, or capricious action. See Mayor, etc., of Jersey City v. Town of Harrison, 71 N.J.L. 69 (Sup. Ct. 1904), affirmed 72 N.J.L. 185 (E. & A. 1905); Peejay Corp. v. Newark, 136 N.J. Eq. 31 (E. & A. 1944); West Caldwell v. Caldwell, 26 N.J. 9 (1958); Beverly Sewerage Authority v. Delanco Sewerage Authority, *609 65 N.J. Super. 86 (Law Div. 1961), affirmed 70 N.J. Super. 575 (App. Div. 1961). From a reading of these cases it is evident that this court should not concern itself with the wisdom of the executed contracts. If the municipalities, or their agents, had the power to make them then the question whether it was wise to do so and whether their terms were advantageous was solely for their consideration and resolution. It is reasonable to assume that public officials charged with the duty of providing proper sewage conditions embarked upon their task with that care, wisdom, and foresight appropriate for such undertaking. But even if doubt exists whether they have reached the best possible solution to this perplexing problem the sole duty of the court is to determine whether the contract in question is lawful.
In essence, the disputing municipalities contend that a bad or hard bargain was struck. Even were this so, this court, under its limited equitable jurisdiction, cannot relieve from hard bargains simply because alleged as such. It is not the function of a court to make a better contract for the parties than they have made for themselves. There could be no virtue or stability in the statutory right conferred upon municipalities to contract for the service of an authority if, after such agreement is made and during the period covered thereby, its terms may be altered. Particularly, when bonds have been issued to finance the project and purchasers thereof have relied upon the initial schedule of rates and the other essential terms of the contract, in effect at the time of its execution. Additionally, the same reliance, upon the original contract, was placed by all other participants. To grant the relief requested by the contestants would be to the detriment of these signatories.
In Phoenix v. Kasun, 54 Ariz. 470, 97 P.2d 210 (214 Sup. Ct. 1939), the court held:
"* * * the relationship between them [the parties] was purely contractual in its nature, and that such being the case, the reasonableness or unreasonableness of the rates fixed by the contract are *610 not subject to review by the court. The only right which it has under the circumstances is to determine whether the city is complying with the terms of its contract, since there is no allegation that there was any fraud in its inception."
United Gas Corporation v. City of Monroe, 236 La. 825, 109 So.2d 433 (Sup. Ct. 1959), involved a suit wherein plaintiff sought to enjoin the enforcement of a rate schedule determined by its franchise contract with a municipality. The court, in noting the long standing distinction between municipal rate regulation by its police power and by contract under its proprietary power, opined that the issue of confiscatory rates arises only when a rate is fixed by compulsion under municipal police power:
"* * * Where, however, the public service corporations and the governmental agency dealing with them have power to contract as to rates, and exert that power by fixing contract rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and therefore the question of whether such rates are confiscatory becomes immaterial * * *" (109 So.2d, at p. 439)
As to the right of public service corporations to judicial relief from contract rates which have become inadequate see 6 A.L.R. 1659 (1920); 10 A.L.R. 1335 (1921); 74 L.Ed. 234, 239 (1930); and City of Des Moines v. City of West Des Moines, 30 N.W.2d 500 (Iowa Sup. Ct. 1948).
Although the United Gas case and the annotations cited above involve public utilities, their rationale is nevertheless apposite. These matters were ones wherein aid of the court was sought by a profit-making public utility corporation to avoid, or be relieved from, the terms of a contract it made with a municipality or some subdivision of state government. In most of these cases relief was denied, the courts holding that a valid contract was executed and the utilities were bound thereby, even though proof was established that they were operating at a loss. However, there were proofs that *611 these companies previously operated at a profit. It may perhaps be said that, on grounds of public policy, greater liberality was extended to the municipalities and their citizen-taxpayers. In the instant case we do not have a profit-making utility company opposing a municipality. We are here dealing with a "public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions to provide for the public health and welfare." N.J.S.A. 40:14A-7. The authority, needless to say, is a non-profit organization.
Incidental to the issue here under consideration is the theory and doctrine of ultra vires raised by the disputing municipalities who contend that the schedule of rates provided in the contract is so unreasonable as to be illegal, ultra vires and against public policy. In support thereof these municipalities cite a dictum in Beverly Sewerage Authority, supra, as authority for the proposition that judicial review may be had as to the reasonableness of rates:
"The reasonableness of the term and conditions would always be subject to judicial review. Such contract may be authorized, but under some circumstances they may be so unreasonable as to be ultra vires. The substantive defense of ultra vires would in such an instance be available." (at p. 95.)
As authority for the above proposition the court in the Beverly case cites Spoerl v. Pennsauken, 14 N.J. 186 (1954). In Spoerl the court held ultra vires a deed given by a municipality containing a covenant relieving property owners from assessment for sewer improvement. The rationale of the court in granting relief was based upon the impropriety of "giving away" public moneys. In the case sub judice there is no such "giving away." Rate charges calculated upon the quantity of sewage disposed is a substantial quid pro quo. N.J.S.A. 40:14A-23 provides inter alia, that "any such contract may be made with or without consideration and for a specified or an unlimited *612 time and on any terms and condition. * * *" Furthermore, the parties have properly contracted in accordance with statutory authority. Notwithstanding Beverly's dictum allowing judicial review of the reasonableness and terms of such contracts, I feel constrained by the cited authorities to declare the court's inability to grant relief where a valid contract exists. Many cases involving alleged contracts have been earnestly contested, only to result in decision that no valid contract existed or, if existing, had been abrogated, thus justifying the granting of relief. See 74 L.Ed. 234, 252 (1930).
The granting of summary judgment to the plaintiff with its consequential denial of plenary trial to inquire into the reasonableness of the rates, as requested by the defendants, may at first blush appear to be harsh. The contract contains no true escape clause; its term is unlimited; under N.J.S.A. 40:14A-35 there is no review by any state agency of the reasonableness of the rates; and the court herein is deciding that as long as the municipalities and the authority have the statutory power to execute the contract there can be no inquiry into the reasonableness of the rates. Because of bond issues, considerable capital expenditures by the authority, and for the other reasons enumerated herein, I believe the Legislature intended that firmness, stability and unalterability should be given to a contract such as the one under consideration.

CONCLUSION.
For all the reasons above stated, this court is of the conclusion that no genuine issue exists as to any material fact and that plaintiff is entitled to judgment as a matter of law on its complaint and to a dismissal of the counterclaims.
An appropriate order for judgment in accord with this opinion shall be presented, duly consented to by counsel as to form or on proper notice pursuant to R.R. 4:55-1.