PUBLIC SERVICE ELECTRIC AND GAS COMPANY, A CORPORA-
TION OF THE STATE OF NEW JERSEY, JERSEY CENTRAL
POWER & LIGHT COMPANY, A CORPORATION OF THE
STATE OF NEW JERSEY, AND ATLANTIC CITY ELECTRIC
COMPANY, A CORPORATION OF THE STATE OF NEW JER-
SEY, APPELLANTS AND CROSS-RESPONDENTS, v. THE NEW
JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION
AND THE STATE OF NEW JERSEY, RESPONDENTS AND
CROSS-APPELLANTS.

ROLLINS ENVIRONMENTAL SERVICES (N.J.), INC., RESPON-
DENT, v. THE NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION, APPELLANT.

MAGNESIUM ELEKTRON, INC., A NEW JERSEY CORPORATION,
RESPONDENT, v. THE NEW JERSEY DEPARTMENT OF EN-
VIRONMENTAL PROTECTION AND THE STATE OF NEW
JERSEY, APPELLANTS.

Argued September 9, 1985—Decided November 25, 1985.

*Roger M. Nelson* and *Scott M. DuBoff,* a member of the District of Columbia bar, argued the cause for appellants and cross-respondents (*Roger M. Nelson,* attorney; *Scott M. De-Boff, Robert O. Brokaw, Carl L. Sulzberger* and *James E. Franklin,* of counsel).

*Paul H. Schneider,* Deputy Attorney General, argued the cause for respondents and cross-appellants (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J.*

*Ciancia,* Assistant Attorney General, and *Deborah T. Poritz,* Deputy Attorney General, of counsel).

*Alvin E. Granite* argued the cause for respondent Rollins Environmental Services (NJ), Inc. (*Granite and Heim,* attorneys; *Alvin E. Granite* and *Craig H. Klayman,* of counsel and on the brief).

*Richard M. Conley* argued the cause for respondent Magnesium Elektron, Inc., etc. (*Schaff, Mahon, Motiuk, Gladstone & Conley,* attorneys; *Richard M. Conley* and *I. Leo Motiuk,* of counsel; *I. Leo Motiuk,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

The central issue in this appeal is whether the Department of Environmental Protection has correctly established permit fees for dischargers of heated effluent into the State's waterways. The statutory scheme prescribes that such permit fees "shall be based upon * * * the estimated cost of processing, monitoring and administering the * * * permits." *N.J.S.A.* 58:10A–9. In deciding that issue we must determine whether the agency has fairly allocated its costs among all categories of permit holders and whether within the category of thermal dischargers it may base the individual permit costs on the volume of the heated effluent discharged. We also address the issue of whether the Appellate Division's partial invalidation of the permit fees charged to industrial dischargers should be prospective.

We hold that (1) the volume-based fees for thermal dischargers are within the general authority granted to the Department by the Legislature, and (2) the decision with respect to industrial dischargers should be applied retroactively only to the parties who are before the Court challenging the fee schedule.

I

The Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), 33 *U.S.C.A.* §§ 1251 to 1376 (1978),

established a comprehensive new program to clean up the nation's waters.[1] Key to the act is the National Pollutant Discharge Elimination System (NPDES), which makes it illegal for anyone to discharge pollution into the nation's waters without a permit. 33 *U.S.C.A.* §§ 1311, 1342. In the interests of federalism, Congress provided that the NPDES program could be administered by states through a system of program delegation under which a state may issue NPDES permits for discharges into navigable waters within its jurisdiction, "but only upon EPA approval of the State's proposal to administer its own program." *EPA v. State Water Resources Control Bd.*, 426 *U.S.* 200, 208, 96 *S.Ct.* 2022, 2026, 48 *L.Ed.*2d 578, 585 (1976). The laudable goal of the Clean Water Act was to rid the nation's waters of pollution by 1985. 33 *U.S.C.A.* § 1251(a)(1), (2).

New Jersey's Water Pollution Control Act acknowledged this delegation. *L.* 1977, *c.* 74, § 2 (codified at *N.J.S.A.* 58:10A–1 to –20). Recognizing that pollution of our water continually endangers the health of our citizens, the Legislature noted

that the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92–500; 33 U.S.C. 1251 et seq.) establishes a permit system to regulate discharges of

---

[1]"[T]he Amendments introduced two major changes in the methods to set and enforce standards to abate and control water pollution. First, the Amendments are aimed at achieving maximum 'effluent limitations' on 'point sources,' as well as achieving acceptable water quality standards. A point source is 'any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged.' An 'effluent limitation' in turn is 'any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constitutents which are discharged from point sources ... including schedules of compliance.' Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based effluent limitations—specified levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform." [*EPA v. State Water Resources Control Bd.*, 426 *U.S.* 200, 204–05, 96 *S.Ct.* 2022, 48 *L.Ed.*2d 578, 583 (1976) (footnotes omitted).]

pollutants and provides that permits for this purpose will be issued by the Federal Government or by states with adequate authority and programs to implement the regulatory provisions of that act. It is in the interest of the people of this State to minimize direct regulation by the Federal Government of wastewater dischargers by enacting legislation which will continue and extend the powers and responsibilities of the Department of Environmental Protection for administering the State's water pollution control program, so that the State may be enabled to implement the permit system required by the Federal Act. [*N.J.S.A.* 58:10A–2.]

The New Jersey Water Pollution Control Act, like the Federal Act, established a comprehensive program, including provisions for a permit program:

It shall be unlawful for any person to discharge any pollutant, except in conformity with a valid New Jersey Pollutant Discharge Elimination System permit that has been issued by the commissioner pursuant to this act or a valid National Pollution Discharge Elimination System permit issued by the administrator pursuant to the Federal Act, as the case may be. [*N.J.S.A.* 58:10A–6(a) (footnote omitted).]

"Pollutant" includes "thermal waste * * * discharged into the waters of the State." *N.J.S.A.* 58:10A–3(n).

## II

*N.J.S.A.* 58:10A–9 governs the application for the necessary permits. It provides:

Applications for permits shall be submitted within such times, on such forms, and with such signatures as may be prescribed by the commissioner and shall contain such information as he may require. *The commissioner shall, in accordance with a fee schedule adopted by regulation, establish and charge reasonable annual administrative fees, which fees shall be based upon, and shall not exceed, the estimated cost of processing, monitoring and administering the NJPDES permits.* [*N.J.S.A.* 58:10A–9 (emphasis added).]

This case concerns the fee schedule adopted by the DEP on December 23, 1982, for the 1982–1983 fiscal year. In October 1980, the DEP proposed regulations to implement the New Jersey Pollutant Discharge Elimination System (NJPDES) program, including proposed administrative fees under *N.J.S.A.* 58:10A–9 for 1981–1982. The parties agree on how the fees were structured. The fees were based on a three-step process. First, the Department estimated its overall costs for the NJPDES surface-water program. Next, it allocated these costs among the three surface-water discharge categories: industrial,

municipal, and thermal.[2]  Finally, it applied volume-based for-
mulas to yield individual fees for permittees within these three
basic categories.  Though volume-based, the fee methodology
varied depending on the category.  For thermal dischargers,
the fee was based on the permittee's "heat loading," *N.J.A.C.*
7:14–1.8(c)(3)(iv), or total volume of heat discharged into the
receiving waters; it reflected a single pollutant and was mea-
sured in BTUs (British Thermal Units), *N.J.A.C.* 7:14A–1.8(e)(3).
With respect to industrial dischargers, each of which may
discharge as many as seventeen pollutants, the total discharge
was determined by chemical oxygen demand (COD) so that the
actual fee was based upon the single pollutant present in the
largest volume in the particular discharge.  *N.J.A.C.* 7:14A–1.-
8(c)(3)(ii) and (e)(2).  As for municipal dischargers, the quantity
of $BOD_5$ (biological oxygen demand) was chosen as the single
parameter upon which the fee was computed.  *N.J.A.C.* 7:14A–
1.8(c)(3)(i).

These regulations were adopted on March 6, 1981.  A group
of electric utilities, including these utility plaintiffs (hereinafter
referred to as "electric utility group" or "group"), appealed the
1981–1982 permit fees but settled the matter on February 23,
1982, by a stipulation whereby the DEP agreed to provide
financial data to support future NJPDES fees, including identi-
fication of the various categories of expenses and the corre-
sponding expenditures underlying each of the three discharge
categories.

In July 1982, DEP formally proposed its 1982–1983 NJPDES
fee regulation reflecting an overall budget of $2,561,825 for

---

2"Thermal discharge" is "that component of any discharge which is com-
prised of heat," or any discharge consisting solely of non-contact cooling water.
Municipal discharge is any "municipal sewage or industrial waste of a liquid
nature," treated by a municipally-owned device or system, including any
sewers, pipes or other conveyances which convey wastewater to a publicly-
owned treatment work.  *Industrial discharge is any other regulated, non-do-
mestic discharge into surface waters.  N.J.A.C.* 7:14A–1.9.

industrial, municipal and thermal dischargers.[3] The electric utility group and other NJPDES permittees appealed the fee regulation after the January 1983 publication of its adoption. The various appeals were consolidated for disposition in the Appellate Division. That court set aside the industrial fees. *Public Serv. Elec. and Gas v. New Jersey Dep't of Envtl. Protection*, 193 *N.J.Super.* 676 (1984).[4]

With respect to the thermal fees, the majority of the Appellate Division concluded that a volume-based fee schedule for thermal discharges was appropriate with one pollutant of equal environmental injury. *Id.* at 685. The dissenting judge concluded that the statute should not be read to refer to the estimated costs of the program "in the aggregate"; rather, the more equitable and reasonable interpretation of the statute— the one that should be followed—would be to base fees upon the cost of processing, monitoring, and administering each individual permit. *Id.* at 686 (Joelson, J.A.D., dissenting).

Following a rehearing concerning the refund requirement for industrial fees, the Appellate Division reaffirmed its determination that refunds should be made based on the difference

---

[3]This budget figure reflects the costs of processing NJPDES surface-water permits and managing the permit program; it includes salaries, fringe benefits, indirect costs mandated by the Department of Treasury, printing and office supplies, data processing, professional services, and maintenance and rental of equipment and vehicles.

[4]The Appellate Division invalidated the industrial fee schedule because it did not take into account the toxicity or the potential hazard of the measured pollutant which forms a basis of the fee. *Public Serv. Elec. and Gas v. New Jersey Dep't of Envtl. Prot.*, 193 *N.J.Super.* 676, 683–84 (1984). Hence, in its view, a permittee whose fee is based upon a relatively low volume of a highly toxic pollutant, which can have a great impact on the environment, pays less than a relatively high-volume discharger of a non-toxic, harmless pollutant. The court ordered that the excess fees be refunded in accordance with the methodology set out in *In Re Fees of State Bd. of Dentistry*, 84 *N.J.* 582 (1980). *Public Serv. Elec. and Gas v. New Jersey Dep't of Envtl. Prot., supra*, 193 *N.J.Super.* at 685. No appeal was taken from that decision.

between the invalidated fees and a reasonable fee for the past periods to be determined on remand. The court made it clear that no cash refunds were required; only credits against future permit fees would be required for past overpayment. Before us the Department is challenging the retroactivity of the refund and the electric utility group is challenging the thermal regulations.[5]

## III

In light of the executive function of administrative agencies, the judicial capacity to review administrative actions is limited. *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n*, 93 *N.J.* 384, 390 (1983). Though sometimes subsumed in the search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. *Campbell v. Department of Civil Serv.*, 39 *N.J.* 556, 562 (1963); *see also Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80 (1980) (court will reverse decision of administrative agency only if it is arbitrary, capricious, or unreasonable or if it is not supported by substantial credible evidence in the record as a whole).

We address the major contentions advanced by the thermal dischargers in the context of these principles.

---

[5]Though they may also have discharges classified as "industrial," appellants are primarily thermal dischargers. As such, they focus their challenge on the NJPDES permit fee provisions relating to thermal dischargers.

A. *Does the act require the DEP to recover the costs incurred in processing individual permits, or may the agency develop a fee schedule to recover costs in the aggregate?*

This issue requires us to consider only the first prong of the three-part test for review of agency action, whether the Department followed the mandate of its enabling act to develop a cost-based permit program. All agree that the Water Pollution Control Act is not a revenue-raiser. As such, the Commissioner's regulatory power includes the right to charge fees designed to defray costs as long as such fees do "not 'exceed the bounds of reason considered in connection with the service and the cost of the service granted.' " *Moyant v. Borough of Paramus*, 30 *N.J.* 528, 546 (1959) (quoting *Daniels v. Borough of Point Pleasant*, 23 *N.J.* 357, 361 (1957)). The fees are presumed to be reasonable until the objectors prove to the contrary. *Bellington v. East Windsor*, 17 *N.J.* 558, 568–69 (1955).

The core of the thermal dischargers' argument here is that the conjunctive language in *N.J.S.A.* 58:10A–9 mandates that the State institute a fee program that will develop costs for the processing of each individual permit, and that only those demonstrated costs may be recovered from individual permit holders. We disagree that the Legislature mandated such an effect. The act states broadly that the Commissioner shall "establish and charge reasonable annual administrative fees, which fees shall be based upon, and shall not exceed, the estimated cost of processing, monitoring and administering *the NJPDES permits.*" *Id.* (emphasis added). We interpret this to mean all of the permits.

As the Appellate Division noted, when the Legislature has intended that individual licensees be charged fees related to the specific costs of administering the program features relative to each individual licensee, it has done so. *Cf. N.J.S.A.* 5:12–139

(casino licensees must reimburse Casino Control Commission for actual costs of investigation). Nothing in the history of *N.J.S.A.* 58:10A–9 suggests a comparable legislative intent here. In the course of extended hearings over the rate schedules, some observers noted that the process advocated by these thermal dischargers would burden the DEP with unnecessary red tape, which, in turn, would vastly increase the costs of administering the program. We are satisfied that the DEP correctly construed its enabling legislation in concluding that the Legislature mandated that the fees not be a revenue measure, but be broadly related to the overall costs that it incurs in processing, monitoring, and administering all of the NJPDES permits in the aggregate.

B. *Has the DEP fairly allocated the aggregate costs of the program among the categories of dischargers?*

In reviewing this issue, we must consider the second and third prongs for agency review: whether there is substantial evidence in the record to sustain the allocation and whether the allocation is arbitrary in light of the evidence.

The DEP sets forth in the record the overall budgeted allocations for 1982–1983 in the amount of $2,561,825. The Department made a further breakdown into the three broad categories: industrial dischargers ($1,140,550), municipal wastewater treatment plants ($768,547), and thermal dischargers ($652,728).

Although arguing that the DEP's $2.5 million figure is self-justifying and not based upon an objective analysis of need, the thermal dischargers recognize that the record is adequate to sustain an overall agency budget of $2.5 million for the NJPDES permit program. The thermal dischargers vigorously challenge the factual basis for the allocation of $652,728 to

their group.[6] The amount in dispute appears to be about $210,000. In its August 5, 1982 comments to the DEP, the electric utility group stated that it had assumed that the deletion of the costs of processing certain federal variance activities as a result of the resolution of the 1981–1982 budget dispute would reduce the thermal budget to $440,000.[7]

More fundamentally, the group challenged the 1982–1983 allocation on the basis that the DEP had not demonstrated the factual basis for the allocation. In the 1981 stipulation of settlement, the DEP agreed to furnish the data adequate to support the lawfulness of future NJPDES fees. In particular, the group argues that the DEP has not responded to its specific inquiries during the course of the regulatory process.

The DEP relies upon the following record facts in support of its cost-based allocation. First, the permit process has a certain level of functional equivalence for each basic category of permits: municipal, industrial, and thermal.[8] Second, the propor-

---

[6]The DEP does not argue that, under the legislation, it need not conform the allocation among categories to actual costs so long as total program fees do not exceed total program costs.

[7]The Group explained this viewpoint thus: the 1981–1982 thermal budget was $600,000 (15 work-years times $40,000 per work-year). This budget included four work-years, or $160,000, for activities related to section 316(a) variances. In accordance with section 316(a) of the Clean Water Act, 33 U.S.C.A. § 1326(a), a discharger may obtain a variance from a thermal effluent requirement if it can be demonstrated that a less stringent requirement will provide adequate protection for the fish and wildlife in that body of water. As part of a stipulation of dismissal of the electric utility group's challenge to the 1981–1982 rates, DEP agreed that the section 316(a) costs would not be recovered under the general NJPDES fee schedule and would be recovered on a case-by-case basis from the specific permit holders.

[8]DEP submits this description of the costs common to each permit:

   [I]n processing each permit application DEP must insure that the permit requires compliance with appropriate State and federal effluent limitations and, further, that it includes discharge restrictions which assure compliance with water quality standards for the affected waterway and consistency with areawide plans. N.J.S.A. 58:10A–6f(1). Detailed compliance

tion of costs related to the categories is roughly derived from the number of permits processed. There are 465 industrial permits, 358 municipal permits, and 338 thermal permits. The percentage of NJPDES efforts directed to thermals is therefore approximately 30%. Since the total budget is $2,561,825, DEP contends that the $652,728 allocation is rationally related to the Department's effort. Finally, the DEP points out that in constructing its fee schedule, it has, in fact, created a schedule that generates only 25% of program costs from thermal dischargers.

The utility group counters by arguing, in an attachment to its brief before us, that the group's audit experience belies such assumptions. It takes the DEP's budget classifications for the various items of effort, such as the development of draft permits, compliance inspection reports, inspections and conferences, and attempts to demonstrate that in fact the fees charged are vastly disproportionate to the actual work effort. The argument is persuasive but not dispositive in an appellate attack because it comes outside the record and does not permit the agency to respond on the record, as it does in its brief, that the exhibit contains erroneous assumptions, covers a small

---

schedules, including interim deadlines and regular compliance reports, must be developed where applicable. *N.J.S.A.* 58:10A–6f(3). Appropriate monitoring provisions must be written for each permit. *N.J.S.A.* 58:10A–6f(5). In processing each permit application and issuing each permit, DEP must make provision for public notice of permit applications, review and consider public comments, and provide an opportunity for a public hearing thereon. *N.J.S.A.* 58:10A–9b, d. Moreover, the State Act clearly contemplates that DEP will monitor each permit by reviewing the monitoring reports which each discharger is required to submit, *N.J.S.A.* 58:10A–6f(5), and by making actual site inspections. *N.J.S.A.* 58:10A–6g; *In re Department of Environmental Protection*, 177 *N.J.Super.* 304 (App.Div.1981). In addition, administering the permits is an on-going process. For example, all permittees must submit information to DEP concerning any contemplated facility expansion or modification. *N.J.S.A.* 58:10A–6f(4). Also, DEP must constantly evaluate information available to it to determine whether adequate environmental protection requires any permit modification, suspension or revocation. *N.J.S.A.* 58:10A–7b. Moreover, each permit is effective for at most five years, so that the regulatory task of processing permits is continuous. *N.J.S.A.* 58:10A–7a.

number of permits examined, and does not cover all permit-related activities in the regulatory process.

Suffice it to say that as an appellate court reviewing agency action, we do not sit to resolve factual disputes. *See Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs.*, 96 *N.J.* 456, 474 (1984) (to permit a party in court to raise objections to a rule and to submit evidence concerning those objections that it failed to raise before the administrative agency at the appropriate time would be to undermine the very purpose of administrative agencies). In some circumstances, remand to the agency for elaboration of its decisional basis is the appropriate course. *See, e.g., Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n*, 98 *N.J.* 458, 473 (1985) (remanding to Commission to examine facts, apply pertinent regulations, and clearly set forth conclusions). In others, a rulemaking or hearing process is recommended. *See, e.g., Texter v. Department of Human Servs.*, 88 *N.J.* 376, 389–90 (1982) (remanding matter to Commissioner for completion of administrative proceedings consistent with Court's opinion). In the circumstances of this case, however, where we deal with a one-year fee schedule, we do not consider a remand appropriate.

The Legislature did not contemplate that the agency would be able to calculate these costs with precision. The legislative intent is evident from use of the critical phrase directing recovery of the "estimated cost" of processing the permits. *N.J.S.A.* 58:10A–9. This language was carefully chosen for its particular significance and we cannot ignore it. The Legislature did not intend to limit the Department's authority strictly to generating revenues equal to expenditures in any given fiscal year; budgeting practicalities simply do not permit this kind of exactitude. By definition,

> [a]n estimate is a mere approximation. * * * The word "estimate" precludes accuracy, and its ordinary meaning is to calculate roughly or to form an opinion from imperfect data. The word "estimate" has no more certainty than the words "about" or "more or less." [*Middlesex County Sewerage Auth. v. Borough of Middlesex*, 74 *N.J.Super.* 591, 604 (Law Div. 1962), *aff'd*, 79 *N.J.Super.* 24 (App.Div.), *certif. den.*, 40 *N.J.* 501 (1963) (citations omitted).]

*See also Borough of Kenilworth v. Raubinger,* 15 *N.J.* 581, 586–87 (1954) (statutory requirement that Commissioner of Education "estimate[ ]" that new educational facilities will be "fully utilized" is not a guarantee of construction).

Thus, we believe the Legislature desired only to reaffirm its long-standing practice under which regulatory licensing programs of agencies are not taxing mechanisms but a means of generating enough revenue to be self-sustaining. In light of this statutory policy, we cannot say that there is an insufficient factual basis for the agency to act, or that in applying the policies of its enabling legislation to the record facts before it the Department made a clear error in judgment with respect to the allocation of costs between the categories.

Hence, although we are left with a sense of some unease about the basis for the allocation among the categories, we cannot say that an allocation that is roughly related to the number of permits in each category and does not generate disproportionately-excessive costs against the category members is invalid as a matter of law.

C. *May the allocation of costs among the thermal dischargers be based upon the extent of their individual discharge?*

▋▋ Since we have concluded that it is not necessary for the Department to determine the individual costs attributable to each licensee, the final issue is whether an allocation of costs within one category—in this case the category of thermal dischargers—may be based upon the extent of individual discharge.[9] Because the factual basis is clearly evident, in reviewing this agency decision our inquiry is focused on the other two prongs of review: whether the agency followed the mandate of the act and whether it made a clear error of judgment in

---

[9] In this respect, it should be noted that there is not a straight-line coefficient under which the fee increases in accordance with volume.

applying the policies of the enabling legislation to the facts in the record.

The electric utility group's statutory argument is that a volume-based system is simply not cost-based. The DEP counters that there is a relationship between the size of a permittee's discharge and the regulatory costs associated with that permit. The group responds by referring us to the fact that the DEP is considering a new method that would relate fees to other factors, such as the nature of the receiving waters, the toxic nature of the discharge, and the number and location of discharge points. They contend that DEP's consideration of such a methodology disproves the volume-based rationale of the 1981–1982 fees.

But even putting aside the issue of costs as a coefficient of environmental impact, there is ample support for a fee-based regulatory system that relates costs to graduated differences in amounts.

> Differences in the amounts of regulatory license impositions may be justified on many grounds. Thus, it is not unreasonable to graduate the fee for a building permit according to the estimated cost of the building. The fee is not necessarily exacted for the mere clerical act of issuing the permit. Its amount may well be fixed with reference to the whole labor and expense connected with the matter, including the examination of the plans and specifications before the permit is issued, and the subsequent inspection of the building while in process of erection, and, finally, the issuing of the certificate to the owner after its completion. That this would involve much more labor and expense in the case of a large building or block than in case of a small one is self-evident, and while this labor might not be exactly in proportion to the cost of the structure, yet the cost probably furnishes the best practicable general standard by which to estimate it. [51 *Am.Jur.*2d *Licenses and Permits* § 116 (1970) (footnotes omitted).]

Our law has been consistent. *Belleville Chamber of Commerce v. Town of Belleville*, 51 *N.J.* 153 (1968). The fact that some fees are graduated on the basis of volume or quantity whereas others are flat fees does not *per se* establish illegality. *Id.* at 157; *see also Independent Warehouses, Inc. v. Scheele*, 134 *N.J.L.* 133, 142–43 (E. & A. 1946), *aff'd*, 331 *U.S.* 70, 67 *S.Ct.* 1062, 91 *L.Ed.* 1346 (1947) (warehouse licensee fee graduated according to storage capacity is presumptively reasonable;

burden rests on challenger to overcome that presumption); *Monmouth Junction Mobile Home Park, Inc. v. South Brunswick,* 107 *N.J.Super.* 18, 26 (App.Div.), certif. den., 55 *N.J.* 30 (1969) (ordinance for licensing of mobil home parks which imposes fees graduated on square-foot basis of mobil home space not *per se* illegal); *South Coast Fisheries, Inc. v. Department of Fish and Game,* 28 *Cal.Rptr.* 537, 540, 213 *Cal.App.*2d 325, 331, *appeal dismissed,* 375 *U.S.* 57, 84 *S.Ct.* 174, 11 *L.Ed.*2d 122 (1963) (privilege tax measured by gross product consumed is valid exercise of state's taxing power); *cf. McKenney v. Byrne,* 82 *N.J.* 304, 319 (1980) (allocation of gross tax receipt revenues of utilities based on schedule of property in municipality involved broad legislative judgment and is not irrational).

This is especially so when we are concerned only with the category of thermal dischargers within which there is no difference in quality of the pollutant but only in quantity. Hence we believe that a volume-based system can have as its purpose recovery of related costs and as such be consistent with the mandate of the act that fees be cost-based, even though individual fees may vary, not on the basis of actual costs, but on the basis of environmental measure.

The only remaining question on this point is whether the Department committed clear error in applying the policies of the act to the facts before it. In the exercise of this review, we must avoid substituting appellate judgment for the agency's judgment. What we seek in reviewing agency action is not a different judgment, but a judgment that reasonable people could reasonably make on the basis of the evidence presented. *Gloucester County Welfare Bd., supra,* 93 *N.J.* at 391 (quoting *Freud v. Davis,* 64 *N.J.Super.* 242, 246 (App.Div.1960)).

In some senses the establishment of these fees partakes of the nature of a quasi-legislative judgment. *See Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs., supra,* 96 *N.J.* at 479 (hospital reimbursement under cost-based system is

premised upon "reasonableness, not actual cost"). Given the administrative precedent in the field of licensing, we cannot say that the agency could not reasonably establish a cost-based permit system graduated by volume of the single pollutant within that category of dischargers.

In sum, we agree with the thermal dischargers that there may be some want of precision in the fees charged to them. There is an intrinsic logic in the point that monitoring the discharge of heated water does not necessarily generate the same environmental effort as would the discharge of dangerous toxic substances. By the same token, logic suggests that there may be an inherent reasonableness in the conclusion that as the volume of pollution increases, the need for environmental response, and therefore the cost, rises. The Department has recognized these problems and is trying to implement a new cost-accounting system that will enable it to sharpen its estimate of costs. In future fee-setting, the hearing process should provide the opportunity to test the evidential claims of the thermal dischargers. If the record demonstrates that their fees are not cost-based, corrective agency action will have to be taken. All recognize that if there is any slack, it will have to be taken up by the municipal and industrial users. Each member of those groups will want to challenge the factual basis asserted by the thermal dischargers that the thermal category is being overcharged. Within the category of thermal dischargers, the DEP's new methodology related to the nature of the receiving waters and other factors may yield more precision.

IV.

■ The final point to be resolved concerns the retroactivity of the refunds ordered by the Appellate Division concerning the industrial permit users. Recently, we restated the principles with respect to civil retroactivity in *Coons v. American Honda Motor Co.*, 96 *N.J.* 419 (1984) (*Coons II*), *cert.* den., —— U.S.

——, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985). A court generally has four approaches to take to civil retroactivity; it can

(1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted. [*Id.* at 425 (quoting *State v. Burstein,* 85 *N.J.* 394, 402–03 (1981)).]

The approach chosen depends upon " 'the court's view of what is just and consonant with public policy * * *' " under the circumstances. *Id.* (quoting *State v. Nash,* 64 *N.J.* 464, 469 (1974)).

The Court in *Coons II* looked to the United States Supreme Court for guidance. That Court has developed an equitable balancing test wherein the factors to be considered include whether the decision establishes a new principle of law, whether retrospective application will further or retard operation of the rule in question, and whether injustice or hardship may be avoided by a holding of retroactivity. *Id.* at 427 (citing *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106–07, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296, 306 (1971)). Balancing all of the factors in this case, we are satisfied that there is not such a clear change in settled policy that would warrant giving only totally prospective effect to the adjudication. On the other hand, we recognize that there are sound policy reasons for not disturbing entirely the pattern of governmental activities established under a regulatory scheme that has been in place for a number of years. *Salorio v. Glaser,* 93 *N.J.* 447, 465, *cert.* den., 464 *U.S.* 993, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983). We believe the Appellate Division correctly balanced these competing concerns in this case by limiting the retroactive effect of its adjudication in two respects: (a) its benefits apply only to the parties before the court and (b) no cash refund is required but only a credit

against future fees, the credit to be determined on the basis of the properly resolved prior fees for the 1982–1983 year.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN— 6.

*For reversal*—None.