[Civ. No. 26173.   Second Dist., Div. Two.   Feb. 21, 1963.]

SOUTH COAST FISHERIES, INC., et al., Plaintiffs and Appellants, v. DEPARTMENT OF FISH AND GAME, Defendant and Respondent.

Real & Real and M. L. Real for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Neal J. Gobar, Deputy Attorney General, for Defendant and Respondent.

HERNDON, J.—This appeal is taken by the several plaintiffs in two consolidated cases wherein judgment was rendered in favor of defendant following a nonjury trial. By their actions appellants seek a refund of moneys paid to the state over a period of several years under the license and tax provisions of division 6, part 3, chapter 1, article 7 of the California Fish and Game Code. The sole issue presented by this appeal is the correctness of the trial court's ruling upholding the constitutionality of said article 7, and particularly sections 8045 and 8047 thereof.

Pertinent sections of said article of the Fish and Game Code provide, in applicable part, as follows: Section 8040, subdivision (a) requires every person engaged in canning, curing, preserving, packing, or dealing at wholesale in fish taken from the waters of this state or brought into this state in a fresh condition to obtain a license. Section 8041 authorizes the licensees to carry on their businesses subject to the provisions of said code for a period of one year. Section 8042, subdivision (a) sets the annual fee for the licenses here involved (i.e., fish canners and processors) at $75. Section 8043 requires that certain specified records be kept. Section 8045 provides:

''Every person operating under a license issued pursuant to this article shall, in addition to the license fee, pay the following privilege tax: (a) Five cents ($0.05) for each hundred pounds, or fraction thereof, of fish other than salmon, purchased, received, or taken by him, (b) In the case of a person who receives salmon from fishermen one-half cent ($0.005) per pound based on the weight of the salmon in the round. Fish so taken or received, other than salmon, mollusks, and crustaceans, which are utilized for human consumption in a fresh state shall not be subject to the tax.''

Section 8046 relates to an additional privilege tax on certain types of fish and is not involved in the present proceeding. Section 8047 requires that the privilege taxes imposed by said article ''shall be paid monthly to the department within 30 days after the close of each month. If any tax is not paid within 60 days after the close of the month for which it is due, a penalty equal to 10 percent of the tax shall be added to it.'' Sections 8048 to 8052 relate to the enforcement of said tax provisions and sections 8055 and 8056, respectively, concern the limitations, and the expenditure of moneys collected pursuant to this article.

By a "Stipulation of Facts" the parties agreed that during all relevant periods, appellants were engaged in the business of processing and canning fresh and frozen fish and marketing the canned product. They were operating under licenses issued in accordance with the above cited article of the Fish and Game Code. During the years involved, appellants purchased frozen fish from both Japanese and domestic sources. The fish purchased from Japanese sources were landed in a frozen condition from oceangoing vessels at Los Angeles harbor. Although some of this product was received in its natural state ("in the round"), most of it had been "gilled and gutted"; that is to say, the gills and the entrails had been removed prior to shipping. While aboard the ships en route to Los Angeles, the fish were carried in refrigerated holds and generally were stacked individually, like a cord of wood. On occasion, these loose fish were wrapped in plastic or burlap, either individually or as packages of three or four. Upon arrival at the port, the fish were unloaded, inspected by the United States Department of Agriculture, and then immediately placed in railroad cars spotted near the dock. These operations were handled by independent contractors. After being loaded in the railroad cars, these fish generally were "iced"; that is, ice was inserted in the cars, and then delivered within one to twelve days to appellants' processing plants when needed and called for. Thus, if the fish were needed at once, they might be taken to appellant's facilities without any "icing," but if not so required, various amounts of ice were placed in the cars dependent upon the estimated number of days that would elapse before they would be needed, and, of course, upon weather conditions.

When delivered at appellants' facilities, the cars were placed upon spur tracks and unloaded by appellants' employees. The fish were then placed upon movable carts or conveyers and transported to nearby public scales for weighing by a "Certified Public Weighmaster." After being weighed, the fish were immediately transported to "fish rooms" within appellants' plants and deposited there to thaw along with other frozen fish. When thawed, they were "gutted," otherwise prepared, and canned. The same basic procedures were followed in processing fish received from domestic sources.

In accordance with the provisions of the Fish and Game

Code, appellants filed monthly "Tax Reports" wherein the amounts, in pounds, as determined by the weighing system described above, were set forth for all fish actually processed without distinguishing their sources, whether foreign or domestic. Some of the fish purchased from Japanese sources were sold "as is" to others and thus were not received at, or processed through, appellants' plants. These fish were not reported by appellants and form no part of the measure of the tax involved herein.

Appellants contend that the tax as applied to imported fish is unconstitutional and void by reason of its being in contravention of article I, section 10, clause 2 of the United States Constitution which provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws; and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Control of the Congress." Basically stated, it is appellants' contention that the tax in question is illegal because it is a disguised tax upon the fish imported before they have lost their character as "imports" under the "original package" doctrine enunciated in *Brown* v. *Maryland,* 25 U.S. (12 Wheat.) 419 [6 L.Ed. 678].

Upon the stipulated facts, the trial court concluded as follows: (1) that section 8045 of the Fish and Game Code provides for an excise tax upon the privilege of engaging in the local business activity of processing and canning fish, the measure of which is determined by the poundage of fish consumed in such business activity, rather than a tax upon the fish or their receipt; (2) that at the time the tax here involved was imposed, the fish had been received and committed to supply, and were essential to the current operating needs of appellants in their canning operations; and (3) that at the time the tax was imposed, the fish had been handled and processed to such an extent that they no longer were either in their original form or in the same condition as they were when they arrived at the port of Los Angeles.

"It is impossible to lay down any positive rule by means of which the character of any given tax may be ascertained. In each case the character of the given tax must

be ascertained by its incidents, and from the natural and legal effect of the language employed in the statute." (*Ingels* v. *Riley*, 5 Cal.2d 154, 159 [53 P.2d 939, 103 A.L.R. 1].)

Where a statute is subject to more than one construction, it is the duty of the courts to give it that construction which will harmonize it with all state and federal constitutional restrictions. (*City of Los Angeles* v. *Belridge Oil Co.*, 48 Cal.2d 320, 324 [309 P.2d 417]; *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321, 326-327 [109 P.2d 935].) Finally, one who challenges the constitutional validity of a statute must show that a violation of a constitutionally protected right has occurred in the very factual situation presented to the court. (*Wholesale Tobacco Dealers Bureau* v. *National etc. Co.*, 11 Cal.2d 634, 661 [82 P.2d 3, 118 A.L.R. 486] and *Max Factor & Co.* v. *Kunsman*, 5 Cal.2d 446, 468 [55 P.2d 177].)

The tax here before us is denominated by the Legislature as a "privilege tax," and it is imposed upon those who would conduct the business activity of packing and processing fish in California. This is made clear by the fact that it is applied to those persons who already have obtained licenses to engage in the specified businesses and section 8045 specifically provides that it is not applicable to fish "which are utilized for human consumption in a fresh state."

Appellants actually do not appear to dispute the fact that the tax here involved is a *privilege* tax; rather they base their arguments upon the premise that such a tax cannot be applied if measured by the quantity of raw materials used in their business where such materials are in part composed of imports that remain, *per se*, free from taxation at the moment of measurement. They appear thus to confuse the *nature* of the tax with the mode adopted for ascertaining its *amount*.

As our California Supreme Court stated in dealing with an analogous situation in *Ingels* v. *Riley*, *supra*, page 160: "We are of the opinion that if a tax in its nature is a privilege tax, it does not become a property tax simply because it is proportioned in amount to the value of the property used in connection with the privilege which is taxed. [Citations.] . . . 'The character of the imposition is not determined by the mode adopted in fixing its amount.' "

The United States Supreme Court in *Flint* v. *Stone Tracy Co.*, 220 U.S. 107 [31 S.Ct. 342, 55 L.Ed. 389], passed upon a similar contention made in regard to a corporation excise

tax computed upon the entire net income of the company from all sources, where a portion of such income was derived from interest on bonds that were exempt from taxation. In rejecting this contention, the court interpreted the tax as being not imposed directly upon tax exempt property, but as an *excise* upon the privilege of engaging in business, indirectly *measured* by reference to property or income therefrom. The court stated at page 162: ''But this argument confuses the measure of the tax upon the privilege with direct taxation of the state or thing taxed. . . .'' And at pages 163-164: '' . . . where a tax is lawfully imposed upon the exercise of privileges within the taxing power of the state or nation, the measure of such tax may be the income from the property of the corporation, although a part of such income is derived from property in itself nontaxable. The distinction lies between the attempt to tax the property as such and to measure a legitimate tax upon the privileges involved in the use of such property.''

Similarly, in *Canton R. Co.* v. *Rogan,* 340 U.S. 511 [71 S. Ct. 447, 451, 95 L.Ed. 488, 20 A.L.R.2d 145], a state franchise tax upon a railroad was challenged because it was measured by gross receipts, a portion of which were derived from moving import and export freight to and from the harbor. It was held that such tax did not violate the import-export clause of the United States Constitution, because it was not a tax upon the *articles* of import and export, but rather upon the *business* of handling these articles.

Remembering that we are concerned here solely with the imposition of the tax upon appellants' canning and processing businesses, it appears inescapable that a *privilege* tax measured by gross product consumed is a valid exercise of the state's taxing power. The fact that some portion of the material used in such enterprises might originally have been exempt from direct taxation is not decisive. Even if it were a fact that the raw materials were *measured* prior to the commencement of the processing thereof, and hence at that time maintained their original exempt character, such fact would be immaterial absent any allegation that such material was not actually consumed thereafter in appellants' processing and canning businesses.

Secondly, it is apparent that whatever may be the true and ultimate interpretation of the ''original package'' doctrine, the United States Supreme Court in the consoli-

dated cases of *Youngstown Sheet & Tube Co.* v. *Bowers* and *U.S. Plywood Corp.* v. *City of Algoma*, 358 U.S. 534 [79 S.Ct. 383, 3 L.Ed.2d 490], has made it clear that goods imported by manufacturers for use in their manufacturing processes lose their tax exempt status as "imports" when they have been committed to, and are essential to, their current operational needs. The court there stated, at pages 549-550:

"The materials here in question were imported to supply, and were essential to supply, the manufacturer's current operating needs. When, after all phases of their importation had ended, they were put to that use and indiscriminate portions of the whole were actually being used to supply daily operating needs, they stood in the same relation to the State as like piles of domestic materials at the same place that were kept for use and used in the same way. The one was then as fully subject to taxation as the other. In those circumstances, the tax was not on 'imports,' nor was it a tax on the materials because they had been imported, but because at the time of the assessment they were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept at the same place in the same way for the same use. We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers."

Since the tax considered by the United States Supreme Court in *Youngstown* and *U.S. Plywood* cases, *supra,* was an ad valorem property tax upon the imported property itself, and such property apparently had been stored for considerable periods of time pending use, it seems clear that a tax upon a processing and canning business may be validly levied, and the amount thereof computed by measuring the materials that are received at the processing plants and which, due to their very nature, are immediately put to the very use for which they were imported.

The stipulated facts might also be held to justify the trial court's holding that the fish had been so acted upon following their receipt as to lose their distinctive character as imports. (*Gulf Fisheries Co.* v. *MacInerney*, 276 U.S. 124 [48 S.Ct. 227, 72 L.Ed. 495]; *E. J. Stanton & Sons* v. *County of Los Angeles*, 78 Cal.App.2d 181 [177 P.2d 804], hearing by the

California Supreme Court denied, and certiorari denied, 332 U.S. 766 [68 S.Ct. 75, 92 L.Ed. 352].) In view of our foregoing analysis, however, we do not deem it necessary now to decide this question.

The judgments are affirmed. The purported appeals from the order denying motions for new trial are dismissed.

Fox, P. J., and Ashburn, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 17, 1963.