TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 85-1001 |
| of | : | JULY 10, 1986 |
| JOHN K. VAN DE KAMP<br>Attorney General | : | |
| ANTHONY S. DA VIGO<br>Deputy Attorney General | : | |

_____

THE HONORABLE JACK C. PARNELL, DIRECTOR, DEPARTMENT OF FISH AND GAME, has requested an opinion on the following questions:

1. What rate of privilege tax shall be paid by a person licensed under section 8040 of the Fish and Game Code for imported shrimp other than the species Pandalus jordani?

2. What rate of privilege tax shall be paid by a person licensed under section 8040 of the Fish and Game Code who cold smokes salmon for human consumption?

3. For purposes of computing the privilege tax prescribed by section 8045 of the Fish and Game Code, when must the fish be weighed?

1

4.    Does the privilege tax prescribed by section 8045 of the Fish and Game Code apply only to the first licensed wholesale dealer or also to subsequent licensed wholesalers?

5.    Is the state estopped from collecting privilege taxes prescribed by section 8045 of the Fish and Game Code for prior years which were not collected or paid because of an erroneous administrative interpretation that such taxes were not due?

6.    Is the state authorized to collect statutory penalties and interest on privilege taxes prescribed by section 8045 of the Fish and Game Code for prior years which were not collected or paid because of the taxpayer's justifiable reliance upon an erroneous administrative interpretation that such taxes were not due?

7.    Is the Director of Fish and Game authorized to forgive the payment of privilege taxes prescribed by section 8045 of the Fish and Game Code for prior years which were not collected or paid because of an erroneous administrative interpretation that such taxes were not due?

## CONCLUSIONS

1.    The rate of privilege tax which shall be paid by a person licensed under section 8040 of the Fish and Game Code for imported shrimp other than Pandalus jordani is $0.0125 per pound.  However, such shrimp which are for human consumption and are not thereafter canned or cooked by a licensee are not subject to such tax.

2.    The rate of privilege tax which shall be paid by a person licensed under section 8040 of the Fish and Game Code who cold smokes salmon for human consumption is $0.0500 per pound, based on the weight in the round.  However, salmon imported for human consumption and which are thereafter cold smoked are subject to such tax only if canned by a licensee.

3.    For purposes of computing the privilege tax prescribed by section 8045 of the Fish and Game Code, the fish must be weighed when initially purchased, received or taken by the taxpayer.  However, the tax applicable to salmon, except imported salmon offal, is based on the weight in the round.

4.    The privilege tax prescribed by section 8045 of the Fish and Game Code applies to the first and to subsequent licensed wholesalers.

5.    Whether the state is estopped from collecting privilege taxes prescribed by section 8045 of the Fish and Game Code for prior years which were not

2

collected or paid because of an erroneous administrative interpretation that such taxes were not due would depend upon the determination of ultimate facts, e.g., whether the case is "unusual," the justification "clear" and the injustice "great."

6.  The state is not authorized to collect statutory penalties and interest on privilege taxes prescribed by section 8045 of the Fish and Game Code for prior years which were not collected or paid because of the taxpayer's justifiable reliance upon an erroneous administrative interpretation that such taxes were not due.

7.  The Director of Fish and Game is not authorized to forgive the payment of privilege taxes prescribed by section 8045 of the Fish and Game Code for prior years which were not collected or paid because of an erroneous administrative interpretation that such taxes were not due.

ANALYSIS

The first inquiry concerns the rate of privilege tax owed by a person licensed under section 8040[1] for imported shrimp other than the species Pandalus jordani. Section 8040 provides:

> "Every person engaged in any of the following businesses shall procure a license for each plant or place of business in which he is so engaged:
>
> "(a) Canning, curing, preserving, packing, or dealing at wholesale in fish taken from the waters of this State or brought into this State in a fresh condition.
>
> "(b) Manufacturing fish scraps, fish meal, fish oil, chicken feed, or fertilizer from fish or fish offal.
>
> "(c) Processing or dealing at wholesale in mollusks or crustaceans in compliance with the rules and regulations of the commission."

Section 8045 prescribes the rate of privilege tax:

> "Every person operating under a license issued pursuant to this article, in addition to the license fee, and a fisherman as described in Section 8015 who sells fish, mollusks, or crustaceans in any load or lot of 100 pounds or more to persons not licensed pursuant to Section 8040, shall

---

[1] All section references herein are to the Fish and Game Code.

85-1001

pay a privilege tax for each pound, or fraction thereof, of fish purchased, received, or taken by him in accordance with the following schedule:

|  |  | Rate per pound |
|---|---|---|
| (a) | All fish, irrespective of use, except as otherwise specified in this section . . . . . . . . . . . . . . . . . . . . . | $0.0013 |
| b) | Mollusks and crustaceans irrespective of use, excluding squid and crab . . . . . . . . . . . . . . . . . . | 0.0125 |
| (c) | Crab and squid, irrespective of use . . . . . . . . . . . . | 0.0019 |
| (d) | Salmon, except imported salmon offal, based on the weight in the round, irrespective of use . . . | 0.0500 |
| (e) | Sardines irrespective of use . . . . . . . . . . . . . . . . . | 0.0063 |
| (f) | The following fish when used for bait or human consumption, except canning . . . . . . . . . . . | 0.0125 |

       (1) Albacore
       (2) Barracuda
       (3) Bluefin
       (4) Broadbill swordfish
       (5) Flying fish
       (6) Frogs
       (7) Giant sea bass
       (8) Halibut
       (9) Saltwater worms
       (10) White sea bass
       (11) Yellowtail

| (g) | Anchovy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.0006 |

Provided, however, that when the price paid as stated on the fish receipt required in accordance with Section 8011 is in excess of fifty dollars ($50) per ton, the tax on anchovy shall be $0.0013 per pound.

"All fish, except shrimp (Pandalus jordani) and crab (Cancer magister), imported into California from another state or country, and which are for human consumption and are not thereafter canned or cooked by a licensee, shall not be subject to such a privilege tax.

"Shrimp (Pandalus jordani) and crab (Cancer magister) imported into California from another state or country, irrespective of use, shall not be subject to such privilege tax."

4

The exemptions provided in the last two paragraphs are of primary concern. Prior to 1971, the exemption, then contained as part of section 8045.5, provided as follows:

"Fish imported into California from another state or country, and which are for human consumption and are not thereafter canned or cooked by a licensee, shall not be subject to such a privilege tax."

The purpose of the exemption was to afford protection to importers of "fish, mollusks, or crustaceans"[2] from double taxation. (Stats. 1970, ch. 549, § 2 [the second section of that number].)

In 1971, section 8045.5 was amended to exclude from its limited exemption (i.e., that applicable only to those imported fish which are (1) for human consumption and (2) not thereafter canned or cooked by a licensee) "shrimp (Pandalus jordani) and crab (Cancer magister)" and to add a second paragraph exempting those specified crustaceans[3] categorically, i.e., "irrespective of use." (Stats. 1971, ch. 1171, § 5.)  By the Statutes of 1974, chapter 1207, sections 10 and 11, section 8045.5 was repealed and the two exemption paragraphs were added unchanged to section 8045 as set forth above.

The specific statutory reference is to a particular genus (Pandalus) and species (jordani) of Pacific Ocean shrimp.  Technical words and phrases are to be construed according to such peculiar and appropriate meaning or definition. (Code Civ. Proc., § 16; 66 Ops.Cal.Atty.Gen. 152, 153 (1983).)  We are advised that Pandalus jordani is the major variety of Pacific Ocean edible prawns taken from the most extensive range from Alaska to central California. Other species are commercially taken, e.g., Pandalus platyceros, from waters off the coast of Santa Barbara.  A wide variety of species and genera are imported from various locations throughout the world, e.g., the European Pandalus annulicornis.  In the context of commercial fishing, numerous species have been the subject of legislative cognizance. Section 8590 provides:

"For the purposes of this article, 'prawns' or 'shrimp', or both, include all of the following species:

"(a) Spot prawn (Pandalus platyceros).

---

[2] The term "fish" includes mollusks and crustaceans. (§ 45.)

[3] Shrimp and crab are classified as crustaceans. (50 Ops.Cal.Atty.Gen. 131, 133 (1967).)

"(b) Ridgeback prawn (Sicyonia ingentis).

"(c) Coonstrip prawn (Pandalus danae).

"(d) Pacific ocean shrimp (Pandalus jordani).

"(e) Bay shrimp (Crangon franciscorum and Crago sp.).

"(f) Red rock shrimp (Lysmata californica)."

Thus, it is manifest that the Legislature is aware of the peculiar and appropriate significance of a specified genus and species. It is recognized that the report of the Senate Committee on Natural Resources and Wildlife on Assembly Bill 608 (Stats. 1971, ch. 1171) refers to the newly exempted categories generally as "imported shrimp" and "imported crab" without reference to the scientific designations "Pandalus jordani" and "Cancer magister," respectively. However, the use of the terms "shrimp" and "crab," even without further designation, has been officially recognized as an alternative means of reference to the particular respective genera and species in question. (Title 14, Cal. Admin. Code, § 103, subd. (b)(1); cf. § 8023.)

We find no basis upon which to attribute to the Legislature an intent to exempt categorically from taxation any species other than that specifically designated. When the term "shrimp (Pandalus jordani)" first appeared in the Statutes of 1971, chapter 1171, section 5, the Legislative Counsel's Digest indicated in part that the amendment "[p]rovides that no privilege tax is applicable to *specified* shrimp and crab imported from another state or country, irrespective of use." (Emphasis added.) Conversely, shrimp other than the specified genus and species were not excluded from the limited exemption of the penultimate paragraph of section 8045.[4]

Consequently, only those shrimp are subject to tax which are (1) taken domestically, (2) other than Pandalus jordani and not for human consumption, or (3)

---

[4] We are not asked nor do we consider any issue concerning the constitutional validity of a tax upon imports. (U.S. Const., art. 1, § 10, cl. 2; 24 Ops.Cal.Atty.Gen. 287 (1955); compare *South Coast Fisheries, Inc.* v. *Department of Fish & Game* (1963) 213 Cal.App.2d 325, 331-332; *Alaska* v. *Arctic Maid* (1961) 366 U.S. 199, 203-204; *Schettler* v. *County of Santa Clara* (1977) 74 Cal.App.3d 990.) It is assumed for purposes of this analysis that the tax is imposed upon a legitimate local taxable event. (Cf. 50 Ops. Cal.Atty.Gen. 131, 134 (1967); 43 Ops.Cal.Atty.Gen. 206, 208, (1964).) In any event, section 8045 has not been declared unconstitutional by an appellate court within the meaning of California Constitution, article III, section 3.5.

other than Pandalus jordani and canned or cooked by a licensee.  With respect to these, the rate of tax specifically applicable under section 8045, subdivision (b) ("crustaceans irrespective of use") is $0.0125 per pound.

The second inquiry concerns the application of a privilege tax to a person licensed under section 8040 who cold smokes salmon for human consumption.  The rate of tax applicable to "salmon, except imported salmon offal, based on the weight in the round, irrespective of use," is prescribed in subdivision (d) of section 8045 as $0.0500 per pound.  This tax would apply to a licensee who cold smokes salmon for human consumption.  The significant issue arises with respect to salmon which are imported from another state or country, and which are for human consumption and are not thereafter canned or cooked by a licensee.  Such fish are, by virtue of the penultimate paragraph of section 8045, not subject to a privilege tax.  Thus, if cold smoked salmon are "cooked," they are subject to tax under subdivision (d).  If not, they are subject to such tax only if canned, but are otherwise exempt.

It may be argued that the term "cooked" refers to fish other than in its fresh state.  Prior to the amendment to section 8045.5 (Stats. 1970, ch. 549, § 2) which first added the exemption for fish imported for human consumption and not thereafter canned or cooked by a licensee, the exemption, then contained in section 8045 (Stats. 1957, ch. 456, § 8045), applied, and had so applied since the statute's inception (Stats. 1917, ch. 687, § 7), to "Fish so taken or received . . . for human consumption in a fresh state . . . ." It is suggested, based upon this legislative history, that "canned or cooked" is simply the antithesis of "fresh state."  The issue, then, would be whether cold smoked salmon is other than fresh.  We are advised in this regard that cold smoking is used to prepare lox, a delicacy for human consumption, having a consistency similar, if not identical, to raw fish.  The Legislature has characterized smoking, along with freezing, coldpacking, drying, salting and pickling, as common methods of preserving fish. (§ 8042, subd. (b).)

In any event, the legislative change of terminology must be viewed as deliberate.  In the absence of some contrary indication, words used in a statute must be construed in accordance with their usual and ordinary significance. (*Moyer* v. *Workmen's Comp. App. Bd.* (1973) 10 Cal.3d 222, 230.)  The usual and ordinary import of the word "cook" involves the preparation of food for eating by a heating process such as boiling, roasting or baking. (Webster's Third New Internat. Dict. (1961), p. 500; *Union Pacific Railroad Co.* v. *Ore-Ida Potato Products* (9th Cir. 1958) 252 F.2d 505, 508.)  According to information provided to this office, the process of cold smoking is essentially as follows:  the fish is cleaned, split and placed in a curing solution consisting of salt and sugar. The fish is then stored in a curing room at a temperature of 38F. for approximately 10 to 14 days.  Once cured, the fish is moved to a drying room where the moisture is extracted from the fish.  The temperature in the drying room is maintained at

7

approximately 75F.-80F. for no more than a few minutes in order to "sweat" the excess brine and moisture from the fish.  The fish is then placed in either a manual smokehouse or an electronic smoker where it is exposed to cold smoke for a few seconds.  No heat is applied during the smoking process.  Based on this description, the fish are not "cooked" within the meaning of section 8045.  Consequently, salmon which are imported for human consumption and thereafter cold smoked are subject to the tax prescribed in subdivision (d) of that section only if canned by a licensee.  Otherwise, they are exempt.

The third inquiry concerns the point at which the fish must be weighed for purposes of applying the appropriate rate of tax per pound.  Section 8045 provides simply that the specified rate of tax shall be paid ". . . for each pound, or fraction thereof, of fish purchased, received, or taken . . . ."  The statute does not otherwise specify the time of weighing, whether in the round, headed, gutted, dressed, fileted, processed or cooked, with one exception: subdivision (e) of the rate schedule provides that salmon, except imported salmon offal,[5] shall be weighed in the round.[6]

Prior to 1935 (Stats. 1935, ch. 456, § 1), the statute, then section 1015 (based on Stats. 1917, ch. 687, § 7, as amended by Stats. 1931, ch. 1163, § 3), contained no specific reference to salmon, but provided as follows:

"Every person operating under a license as provided in this article shall, in addition to the license fee, pay a privilege tax of two and one-half cents for each one hundred pounds, or fraction thereof, of fish purchased, received, or taken by him.  Fish, excepting mollusks and crustaceans, so taken or received, which are utilized for human consumption in a fresh state, shall not be subject to such tax."

By the 1935 statute, specific reference was added to those "who receive salmon from fishermen," prescribing a rate of tax "based on the weight of the salmon in the round":

"Except as otherwise provided herein, every person operating under a license as provided in this article shall, in addition to the license fee, pay a privilege tax of two and one-half cents for each one hundred pounds, or fraction thereof, of fish, other than salmon, purchased, received or taken by

---

[5] "Fish offal" means the heads, viscera and other parts of fish taken off in preparing for canning, preserving, packing and preparing for consumption in a fresh state.  (§ 7700, subd. (c).)

[6] Fish "in the round" refers to their natural state.  (*South Coast Fisheries, Inc.* v. *Department of Fish and Game* (1963) 213 Cal.App.2d 325, 328.)

him.  Persons who receive salmon from fishermen shall, in addition to any other license fee imposed by this code, pay a privilege tax of one-half cent per pound, based on the weight of the salmon in the round.

"Fish, excepting salmon, and excepting mollusks and crustaceans, so taken or received, which are utilized for human consumption in a fresh state, shall not be subject to a privilege tax."

Inasmuch as the special reference to salmon did not appear until 18 years following the enactment of the original 1917 version, we perceive no negative inference of legislative intent respecting the point at which fish other than salmon must be weighed. In the absence of any contrary indication, it is our view that the Legislature intended the rate of tax to be applied to the weight of fish in its condition when initially purchased, received or taken by the taxpayer.  This view is consistent with record keeping requirements.  Section 8043 provides:

"Every person operating under a license issued pursuant to this article, and every other person dealing in fresh fish, shall keep a book or books in which shall be entered:

"(a) A full and correct record, in the English language, of all fresh fish *purchased or received* by him from fishermen *or taken* by himself.

"(b) The names of the different species.

"(c) The *number of pounds so received or caught* of each different species.

"(d) The name and address of the person from whom such fish were received.

"The books shall be open at all times for inspection by the department."  (Emphasis added; see also §§ 8011 through 8024.)

The fourth inquiry is whether the privilege tax applies to the first or to all wholesalers in the commercial chain.  The assumption is that a tax has been paid by a first-tier wholesaler who purchased and received fish from a fisherman and sold to a second-tier wholesaler.  Generally, a wholesaler is a merchant middleman who sells chiefly to retailers, other merchants or industrial, institutional and commercial users mainly for resale or business use. (Webster's Third New Internat. Dict. (1961), p. 2611.) Every person who deals at wholesale in fish taken from the waters of this state or

9

imported in a fresh condition, or in mollusks or crustaceans must procure a license. (§ 8040.)

Section 8045 provides in part that "*Every person* operating under [such] a license . . . shall pay a privilege tax . . . ." (Emphasis added.) The character of a tax must be determined by its incidents, object, purpose and effect, rather than by nomenclature, title or legislative assertion. (*Flynn* v. *City etc. of San Francisco* (1941) 18 Cal.2d 210, 214-215.) While the tax is denominated a "privilege" tax, its measurement in proportion to weight may suggest an ad valorem property tax. (See Cal. Const., art. XIII, § 1; cf. *Pacific Gas & Elec. Co.* v. *Roberts* (1914) 168 Cal. 420.) Although the state constitution does not expressly prohibit double taxation, the requirement of article XIII, section 1, that property shall be taxed in proportion to its value has been construed as such a prohibition. (*Flynn* v. *City etc. of San Francisco*, *supra*, 18 Cal.2d at p. 215; and see, Rev. & Tax. Code, § 102.)

The tax prescribed by section 8045 is not a property tax but a tax on the privilege of conducting the business of dealing in fish. (50 Ops.Cal.Atty.Gen., *supra*, 133.) In *South Coast Fisheries, Inc.* v. *Department of Fish and Game*, *supra*, 213 Cal.App.2d at p. 330, the court stated:

"The tax here before us is denominated by the Legislature as a 'privilege tax,' and it is imposed upon those who would conduct the business activity of packing and processing fish in California. This is made clear by the fact that it is applied to those persons who already have obtained licenses to engage in the specified businesses and section 8045 specifically provides that it is not applicable to fish 'which are utilized for human consumption in a fresh state.'"

Further, the measurement of the tax by the weight, quantity or value of the fish purchased, received or taken by a processor or dealer at wholesale is not inconsistent with its nature as a privilege tax. In *South Coast Fisheries*, *supra*, the court continued:

"Appellants . . . base their arguments upon the premise that such a tax cannot be applied if measured by the quantity of raw materials used in their business where such materials are in part composed of imports that remain, *per se*, free from taxation at the moment of measurement. They appear thus to confuse the *nature of* the tax with the mode adopted for ascertaining its *amount*.

"As our California Supreme Court stated in dealing with an analogous situation in *Ingels* v. *Riley* [(1936) 5 Cal.2d 154, 160]: 'We are

10

of the opinion that if a tax in its nature is a privilege tax, it does not become a property tax simply because it is proportioned in amount to the value of the property used in connection with the privilege which is taxed. [Citations.] . . .  "The character of the imposition is not determined by the mode adopted in fixing its  amount."'"

As stated in *Alaska* v. *Arctic Maid*, *supra*, 366 U.S. at p. 202, regarding a tax imposed by the State of Alaska upon the business of freezing salmon conducted upon freezer ships operating in Alaskan waters measured by the value of salmon received for freezing and transportation to another state:

> "To be sure, the tax is computed on the 'value' of the fish 'bought or otherwise obtained for processing through freezing.'  That, however, is the measure of the tax, not the taxable event.  The taxable event is 'prosecuting' the 'business' of 'Freezer ships and other floating cold storages.'"

> Thus, we find no basis for ignoring the plain meaning of section 8045; "[e]very person" includes every licensed wholesaler.  Thus, we are not presented with a constitutional issue which might otherwise arise by virtue of a tax imposed upon one but not all members of the same class.

> The fifth inquiry is whether the state is estopped from collecting unpaid privilege taxes for prior years because of an erroneous determination by an officer of the Department of Fish and Game that such taxes were not due. The basic doctrine of equitable estoppel requires the presence of four factors:

> "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 489; *Penn-Co* v. *Bd. of Supervisors* (1984) 158 Cal.App.3d 1072, 1080.)

The doctrine may be applied against a public agency

> ". . . when the elements requisite to such an estoppel . . . are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell*, *supra*, at pp. 496-

497; *Penn-Co* v. *Bd. of Supervisors*, *supra*; see also, *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 826.)

It has been held in this regard that equitable estoppel shall not operate against a government agency unless the resulting injustice is "grave" (*County of San Diego* v. *Cal. Water etc. Co.*, *supra*) or "manifest" (*City of Long Beach* v. *Mansell*, *supra*, at pp. 498-499; see *Penn-Co* v. *Bd. of Supervisors*, *supra*, at p. 1081.)

Further, the party invoking the doctrine of equitable estoppel against the government must show extensive reliance; this usually involves many individuals, or a plaintiff whose reliance consisted in giving up some fundamental right, or both these factors. (*Id.* at p. 1081; see, e.g., *City of Long Beach* v. *Mansell*, *supra*, at p. 499; *Killian* v. *City etc. of San Francisco* (1978) 77 Cal.App.3d 1.) Even when sufficient reliance has been established, estoppel will not operate to defeat the effective operation of a policy adopted to protect the public. (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725; *Fullerton Union High Sch. Dist.* v. *Riles* (1983) 139 Cal.App.3d 369, 378.)

In *Fullerton*, the court summarized the factors enunciated in *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297 to determine whether the public agency's conduct was sufficiently culpable to warrant estoppel:

"'[W]hether . . . the inaccurate advice or information is negligently ascertained, whether or to what extent the agency is certain of the information it dispenses, whether the agency purports to advise and direct or merely to inform and respond to inquiries, whether the agency acts in bad faith, whether the claimant is one who purports to have no knowledge or training which would aid him in determining his rights and the public agency purports to be informed and knowledgeable, whether the right of which the claimant is being deprived is significant, and whether a confidential relationship exists between the claimant and the public entity.'" (*Fullerton Union High Sch. Dist.* v. *Riles*, *supra*, at p. 380; see also *Fredrichsen* v. *City of Lakewood* (1971) 6 Cal.3d 353, 358; *State of California* v. *Haslett* Co. (1975) 45 Cal.App.3d 252, 256-257.)

With respect to the inquiry presented, it is noted that the "erroneous administrative interpretation" as to tax liability constituted a mistake of law and, insofar as it was relied upon by a taxpayer, the mistake was bilateral. Ordinarily, equitable estoppel presents a question of fact. (*Shoban* v. *Board of Trustees* (1969) 276 Cal.App.2d 534, 546; *Shamrock Development Co.* v. *City of Concord* (1981) 656 F.2d 1380, 1386.) Acts performed in reliance upon a mutual mistake of law do not create an estoppel. (*Henry* v. *City of Los Angeles* (1962) 201 Cal.App.2d 299; *Shamrock*

*Development Co.* v. *City of Concord, supra*.) "An expression of opinion as to a matter of law is not a basis for estoppel, at least in the absence of actual or professed special knowledge or confidential relationship." (*Gilbert* v. *City of Martinez* (1957) 152 Cal.App.2d 374.)

Nevertheless, we turn to those cases dealing specifically with the collection of taxes. The rationale of those cases is summarized in *Fischback & Moore, Inc.* v. *State Bd. of Equal.* (1981) 117 Cal.App.3d 627, 632:

"The board argues, and we agree, that the state is not estopped from collecting a tax which was due and owing, even though the state's representatives may have previously adopted an incorrect interpretation of the law and advised the public that no taxes would become due on a particular transaction or transactions. (*Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87, 100, 103.) Under well-settled rules of law state officers and state agencies have no power to estop the state from collecting a validly owed tax. The reasons behind such a rule are deeply imbedded in our governmental structure, which is designed to discourage corrupt collusion between government officers and taxpayers to the prejudice of the state's revenues. We, therefore, reject plaintiffs' argument that the board is estopped from collecting the tax, even though its representatives had previously advised plaintiffs no tax would become due."

In *Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87, 100-102, the court stated:

"The state board cites many cases from this and other jurisdictions to the effect that an estoppel based on reliance upon an erroneous construction of the statute by an administrative ruling will not lie against the government, particularly in tax matters. As a general proposition this is sound law. Obviously, a tax administrator should not be permitted by an erroneous ruling to exempt a taxpayer from the obligation to pay taxes."

The court quoted *La Societe Francaise* v. *California Emp. Com.* (1943) 56 Cal.App.2d 534, 553:

"'It is the general rule that the government does not lose its revenues because of an erroneous ruling of an administrative official as to the meaning of a tax law. [Numerous citations.] An administrative regulation which is in conflict with the statute is invalid and the government is not

13

bound thereby. [Citations.] The duty of the tax officials is to collect taxes imposed by law . . . it is generally no defense that taxes were not paid when due in reliance on an official ruling of nonliability. The taxpayer is deemed to act with knowledge that administrative officials cannot bind the government by their erroneous interpretation of tax statutes.'"

In *Illinois Commercial Men's Assn.* v. *State Bd. of Equal.* (1983) 34 Cal.3d 839, 855, the California Supreme Court appeared to leave unresolved a significant issue:

"*U.S. Fid. & Guar. Co.* v. *State Bd. of Equal.* (1956) 47 Cal.2d 384, sets forth the general rules applicable to estoppel of the government in tax matters. Estoppel is available only in the 'unusual case' in which its justification is 'clear and the injustice great.' The failure to collect the tax authorized by a statute is insufficient to justify estoppel, even if the taxpayer relies on an erroneous construction of a statute by an official. (*Id.* at pp. 389-390.) Nevertheless, the opinion proceeds to discuss whether certain conduct of the Insurance Commissioner constituted a 'clear representation' that a portion of the insurer's premiums in that case would not be taxed. It concludes that the commissioner's conduct was not such 'as would satisfy an estoppel in connection with taxes.' (*Id.* at p. 392.) We need not decide whether even a 'clear representation' by a public official that a tax is not payable can immunize a taxpayer from the duty to pay a tax authorized by law, because we determine that such representation was not made in the present case."

While one subsequent appellate case has acknowledged the "clear representation" test as one of the prerequisites for estoppel in a tax matter (*Interinsurance Exchange* v. *State Bd. of Equal.* (1984) 156 Cal.App.3d 606, 615), it is not our prerogative here to declare such a representation an independently sufficient basis for equitable relief where no appellate court in a long line of cases has done so. Nor are we disposed within the context of an advisory opinion to engage in evidentiary investigation which would underlie a categorical determination of ultimate facts in connection with the inquiry presented, e.g., whether this is an "unusual case" in which the justification is "clear and the injustice great." (*Id.* at p. 615.) While we have been presented with no facts which would suggest a basis for such a finding, and while we are aware of no case or circumstances in which estoppel has been or might be applied against the government in direct contravention of a statutory duty to collect taxes (see *People* ex rel. *Franchise Tax Bd.* v. *Superior Court* (1985) 164 Cal.App.3d 526, 551-554), the determination as to whether this is such an "unusual" case falls, of course, within the peculiar province of a judicial proceeding.

The sixth inquiry is whether the state may collect statutory penalties and interest on unpaid privilege taxes for prior years because of the taxpayer's justifiable reliance upon an erroneous determination by an officer of the Department of Fish and Game that such taxes were not due.  With respect to such interest and penalties on unpaid taxes, section 8047 provides:

"Privilege taxes imposed by this article shall be paid monthly to the department within 30 days after the close of each month.

"If any tax is not paid within 60 days after the close of the month for which it is due, a penalty equal to 10 percent of the tax shall be added to it."

Section 8048, subdivision (a) provides:

"If any person operating under a license issued pursuant to this article fails to pay any privilege tax imposed under this article at the time that it becomes due and payable, the amount thereof, *including penalties and interest*, together with any costs in addition thereto, shall thereupon be a perfected and enforceable state tax lien.  Such a lien is subject to Chapter 14 (commencing with Section 7150) of Division 7 of Title 1 of the Government Code." (Emphasis added.)

Nevertheless, while the state, except in an "unusual" case, is not estopped from collecting a tax which was due and owing, even though the state's representatives have previously adopted an erroneous interpretation of the law and advised the taxpayer that no taxes would become due on a particular event or transaction, it may be estopped from collecting penalties and interest where the taxpayer justifiably relied on such advice and failed to pay the tax. (*Fischback & Moore, Inc.* v. *State Bd. of Equal.*, *supra*, 117 Cal.App.3d at p. 632; *Market St. Ry. Co.* v. *Cal. St. Bd. Equal.*, *supra*, 137 Cal.App.2d at pp. 99-103; *La Societe Francaise* v. *California Emp. Com.*, *supra*, 56 Cal.App.2d at pp. 552, 555.)  In *Fischback*, *supra*, at p. 633, the court concluded:

". . . we deduce a general rule that a taxpayer is not required at its peril to know that a state's administrative rulings are erroneous.  Although the taxpayer's liability for the original tax remains, its liability for penalties and interest may be excused. . . .  We think collection of interest on an unpaid tax whose existence the board itself failed to recognize was inequitable and unjustifiable and that the taxpayer is entitled to recover amounts paid as interest."

15

It is concluded that the state may not collect statutory penalties and interest on unpaid privilege taxes for prior years because of the taxpayer's justifiable reliance upon an erroneous administrative interpretation.

The final inquiry is whether the state may forgive the payment of unpaid privilege taxes for prior years because of an erroneous administrative interpretation that such taxes were not due. As previously noted, if a licensee fails to pay a privilege tax when due, the amount thereof "shall thereupon be a perfected and enforceable state tax lien," subject to the provisions of section 7150 et seq. of the Government Code. (§ 8048, subd. (a), *supra*.)

Article XVI, section 6 of the California Constitution prohibits the Legislature from making a gift of public funds or property[7] A transfer of property without consideration is a gift. (Civ. Code, § 1146.) Consequently, the release of a tax lien, which is public property, without consideration would violate the constitutional prohibition. (*Community Television of So. Cal.* v. *County of Los Angeles* (1975) 44 Cal.App.3d 990, 996.) However, the benefit to the state from an expenditure for a "public purpose" is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom. (*Id.* at p. 997; *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281; *Calif. Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210, 216.)

In *Community Television*, it was held that Revenue and Taxation Code section 271, subdivision (a)(3), authorizing a proportionate refund with respect to taxes on property acquired after taxes had become a lien by an organization qualified for the welfare exemption, was in furtherance of that exemption as provided in section 214 of said code, and not in violation of the constitutional prohibition. In *Schettler* v. *County of Santa Clara* (1977) 74 Cal.App.3d 990, escape assessments were levied on imported inventory for prior years which had not been collected or paid because of the county's and taxpayer's reliance upon judicial interpretation, later overruled, that such goods were immune from local taxation. The Legislature then enacted Revenue and Taxation Code section 226 (repealed, Stats. 1984, ch. 678, § 13) providing that the validity of the ad valorem property tax assessments on goods imported prior to 1976 must be determined pursuant to law as it existed before the superseding decision in *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276. It was contended that the Legislature was not empowered

---

[7] California Constitution, article XVI, section 6, provides in pertinent part that "The Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever. . . ." (Cf. 67 Ops.Cal.Atty.Gen. 31, 33-36 (1984).)

by subsequent enactment to remit or surrender the tax which had become due on the lien date.  The court stated (*id.* at pp. 1003-1006):

> "Of course, we have no quarrel with respondent's argument that the tax lien is a vested right of the taxing body; . . . that as a general proposition the Legislature cannot by a subsequent act increase or decrease the rate, remit the tax or in any way surrender, impair or limit rights that have become fixed and vested (*Estate of Skinker*, *supra*).  To this general rule, however, there is a well recognized exception.  It has been consistently held that expenditures of public funds or property which involve a benefit to private persons are not gifts within the meaning of the constitutional prohibition if those funds are expended for a public purpose (*California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210, 216; *County of San Bernardino* v. *Way* (1941) 18 Cal.2d 647, 653; *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281; *County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863, 877; *Winkelman* v. *City of Tiburon* (1973) 32 Cal.App.3d 834, 844-846).  As stated in *City of Oakland* v. *Garrison* (1924) 194 Cal. 298, 302: '[W]here the question arises as to whether or not a proposed application of public funds is to be deemed a gift within the meaning of that term as used in the constitution, *the primary and fundamental subject of inquiry is as to whether the money is to be used for a public or a private purpose.  If it is for a public purpose* within the jurisdiction of the appropriating board or body, *it is not*, generally speaking, to be *regarded as a gift*.' (Italics added.  Accord:  *Doctors General Hospital* v. *County of Santa Clara*, *supra*, 188 Cal.App.2d at p. 286.)  It is likewise settled that if a public purpose is served by the expenditure of public funds, the constitutional prohibition is not violated even though there may be incidental benefits to private persons (*Board of Supervisors* v. *Dolan* (1975) 45 Cal.App.3d 237, 243; see also:  *People* v. *City of Long Beach* (1959) 51 Cal.2d 875; *County of San Diego* v. *Hammond* (1936) 6 Cal.2d  709; *City of Oakland* v. *Williams* (1929) 206 Cal. 315).  Even more importantly, under an unbroken line of cases the determination of what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed by the courts so long as that determination has a reasonable basis (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 746; *County of Alameda* v. *Janssen*, *supra*, 16 Cal.2d 276, 281; *The Housing Authority* v. *Dockweiler*, *supra*, 14 Cal.2d at pp. 449-450; *Veterans' Welfare Board* v. *Jordan*, *supra*, 189 Cal. 124, 145; *Community Television of So. Cal.* v. *County of Los Angeles* (1975) 44 Cal.App.3d 990, 997; *Board of Supervisors* v. *Dolan*, *supra*, 45 Cal.App.3d 237, 243).

"As noted earlier, in the instant case the Legislature expressly found on the one hand that public policy would be served by the enactment providing relief from retroactive legislation and on the other that the potential retroactive application of *Michelin* would be manifestly unfair, inequitable and unjust and would cause severe economic hardship.  In support of the latter finding the Legislature pointed out that importers had reasonably relied on the previous law and could not reasonably foresee the change of law; that as a result of the unexpected tax burden many importers would become insolvent and be driven out of business; finally and even more importantly, that the adverse effect of retroactive taxes on the importing business community would result in a further deterioration of the California labor market.

"That the prevention of undue hardship on employers and the correlative deterioration of the employment situation may constitute a valid public purpose which duly exempts the legislation from the constitutional prohibition against donation of public funds is well illustrated by *California Emp. etc. Com.* v. *Payne*, *supra*, 31 Cal.2d 210.  In *Payne*, the plaintiff was attempting to collect unemployment contributions from defendant employer.  Defendant, believing he had less than the minimum number of employees, had not filed returns.  The applicable statute of limitations was suspended if no returns were filed.  However, six months prior to the filing of the action by the plaintiff, the statute of limitations was changed to provide that it was tolled only if the failure to file returns was intentional.  Although moneys were due and owing and debts had accrued, the court determined that the legislative intent was to provide relief for employers and it upheld the statute against an attack that it constituted a gift of public funds.  The court stated, inter alia, as follows:  'The question remains whether the retroactive application of the amended statute would conflict with the constitutional prohibition against gifts of public money or property to private persons.  (Cal. Const., art. IV, §§ 22, 31.) It has been held that a retroactive amendment to the inheritance tax laws releasing the tax liability of an estate was within the constitutional inhibition.  [Citations.]

"'It is well settled, however, that expenditures of public funds or property which involve a benefit to private persons are not gifts within the meaning of sections 22 and 31 of article IV of the Constitution if those funds are expended for a public purpose, which is a matter primarily for legislative discretion.  [Citation.]  It would appear that *any incidental benefit to the employer* in applying this section to existing causes of action so as to cut off the commission's right to sue for the contributions where no

18

intent to evade the act is present, *may well be outweighed by the public benefit* which would result if enforcement officers spent their time on fresh claims rather than stale ones. An additional element of public benefit is present where, as here, the statutory scheme is not purely a revenue measure but is enacted as part of a broad social program involving continuing contributions and benefits. *Whether the employer would be able to pay a large assessment, based upon many years of innocent delinquencies, becomes important. It is possible that an employer who has not made collections from his employees or set aside a fund for the payment of the assessments, would be rendered insolvent or bankrupt if compelled to pay the amount of the accumulated assessments,* plus interest and penalties. *Under such circumstances, the result would be to force the employer out of business, thereby depriving his employees of work and, to that extent, defeating the* primary *object* of the legislation which is *to protect employees against unemployment.*' (*California Emp. etc. Com.* v. *Payne, supra*, at pp. 216-217; italics added.)

"Based upon *Payne* and the long line of cases cited above, we must conclude that the Legislature supplied sufficient reasons in support of its conclusion that by the prospective application of *Michelin* a valid and well recognized public purpose is served, and also that this determination of the Legislature does have the requisite reasonable basis. Under these circumstances, section 226 squarely falls within the exception to the general rule prohibiting donation of public funds and its constitutional validity must be upheld even though as an incidental matter the importers as private individuals also benefit from its provisions."

Again, a categorical determination of ultimate facts in any case, e.g., whether a public purpose would be served, the existence and effect of undue economic hardship, etc., must depend upon an evidentiary analysis within the province of an essentially judicial proceeding. As noted in *Schettler*, the court will give primary deference to legislative discretion so long as it has a reasonable basis. (*Id.* at p. 1004; *Community Television of So. Cal.* v. *County of Los Angeles, supra*, 44 Cal.App.3d at p. 997.)

With respect to the inquiry presented, the lack of any such legislative pronouncement or indication underscores the absence of any underlying statutory authorization[8] to forego the collection of taxes for prior years. With respect to an

---

[8] We are advised that such authorization was proposed as an amendment to Assembly Bill 1766 (1985-86 reg. ses.) which died in committee.

85-1001

administrative agency, the court stated in *Ferdig* v. *State Personnel Board* (1969) 71 Cal.2d 96, 103-104:

> "'It is settled principle that administrative agencies have only such powers as have been conferred on them, expressly or by implication, by constitution or statute. [Citations.] An administrative agency, therefore, must act within the powers conferred upon it by law and may not validly act in excess of such powers. [Citations.] In accordance with these principles, it has been held in this state . . . that when an administrative agency acts in excess of, or in violation, of the powers conferred upon it, its action thus taken is void. [Citations.]' (See also 66 Ops.Cal.Atty.Gen. 17, 24 (1983); 63 Ops.Cal.Atty.Gen. 840, 841 (1980).)'"

With respect to those powers which may be implied, the court expounded in *Addison* v. *Department of Motor Vehicles* (1977) 69 Cal.App.3d 486, 498:

> "'"But the doctrine of implied powers is not without limitations. It cannot be invoked where the grant of express powers clearly excludes the exercise of others, or where the claimed power is incompatible with, or outside the scope of, the express powers. For a power to be justified under the doctrine, it must be essential to the declared objects and purposes of the enabling act -- not simply convenient, but indispensable. Any reasonable doubt concerning the existence of the power is to be resolved against the agency." [Citation.]'" (See also 67 Ops.Cal.Atty.Gen. 325, 330 (1984.)

> Similarly, a public officer has only such powers as have been conferred by law, expressly or by implication. (65 Ops.Cal.Atty.Gen. 321, 325 (1982) -- county recorder; 65 Ops.Cal.Atty.Gen. 467, 468 (1982) -- Governor; 63 Ops. Cal.Atty.Gen. 840, 841 (1980) -- State Treasurer without authority and therefore precluded from borrowing against time deposits even for purposes of reinvestment at higher rates without increase in attendant risk.) We have reached similar conclusions with regard to the authority of tax collectors. (68 Ops.Cal.Atty.Gen. 223, 224 (1985); 62 Ops.Cal. Atty.Gen. 504, 508 (1979).) Hence, it is concluded on purely statutory grounds that the state may not forgive the payment of unpaid privilege taxes for prior years.[9]

****

---

[9] In view of the conclusion reached herein, it is not necessary to discuss the application of California Constitution, article XIII, section 31: "The power to tax may not be surrendered or suspended by grant or contract."